IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas
**ENTERED**
April 01, 2016
David J. Bradley, Clerk

§
IN RE KEY ENERGY SERVICES, INC. §
SECURITIES LITIGATION        §        CIV. A. NO. 4:14-CV-2368
§

**OPINION AND ORDER**

The above referenced securities-fraud, putative class action alleges material misrepresentations and omissions by Defendants regarding Key Energy Services, Inc.'s ("Key's") financial condition and the future of its business, leading to inflated stock prices in violation of §§ 10(b), control person liability under 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b)(2), *et seq.*, Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and by the Foreign Corrupt Practices Act of 1977 (the "FCPA"), 15 U.S.C. § 78dd-1, *et al.*, by overstatement of lucrative business opportunities in foreign countries despite significant, highly publicized risks, particularly in Mexico and Russia, and by failure to disclose serious deficiencies in Key's internal control systems to protect Key from the threat of FCPA violations and to attract and maintain investor interest in Key's business operations in areas known for corruption.

Pending before the Court are two motions to dismiss the Consolidated Amended Complaint (instrument #37) of Lead Plaintiff Inter-Local Pension Fund of the Graphic Communications of the International Brotherhood of Teamsters, pursuant to the PSLRA and Federal Rules of Civil Procedure 9(b) and 12(b)(6), filed by (1)

Defendants Key Energy Services, Inc. ("Key"),[1] Richard J. Alario ("Alario"),[2] J. Marshall Dodson ("Dodson"),[3] and Newton W. "Trey" Wilson III ("Wilson")[4](#49); and (2) Defendant Taylor M. Whichard, III  (#50),[5] who also joins in #49.

    This action is brought on behalf of a putative class composed of all persons and entities, excluding Defendants and their affiliates, who or which purchased or acquired Key's common stock from September 4, 2012 to July 17, 2014 (the "Class Period").

## I.  Standards of Review

## A.  Rule 12(b)(6)

    When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded

---

[1] Key, based in Houston, Texas, is an on-shore, rig-based, well-servicing contractor which provides the full range of well intervention services (including the completion of newly drilled wells, workover of existing oil and natural gas wells, well maintenance, and specialty drilling services) in all major onshore oil- and gas-producing regions of the United States, as well as in Mexico, Colombia, Ecuador, the Middle East, and Russia.

[2] Alario at all relevant times was Key's Chairman, President, and Chief Executive Officer.

[3] Dodson served as Vice President and Treasurer of Key from 2009 until March 25, 2013, when he succeeded as Key's Senior Vice President and Chief Financial Officer.

[4] Wilson at all relevant times served as Key's Executive Vice President and Chief Operating Officer.  As of May 20, 2014 Wilson served as Key's Executive Vice President responsible for international operations, technology development, and corporate strategy.

[5] Whichard was Key's Senior Vice President and Chief Financial Officer.

facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).   The plaintiff's legal conclusions are not entitled to the same assumption. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."), *citing Bell Atlantic Corp. v. Twombly*, 556 U.S. 662, 678 (2007); *Hinojosa v. U.S. Bureau of Prisons*, 506 Fed. Appx. 280, 283 (5th Cir. Jan. 7, 2012).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted).   "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint

allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*, 556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556. Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

In *Ashcroft v. Iqbal*, 556 U.S. at 679, the Supreme Court stated that "only a complaint that states a plausible claim for relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b). *Iqbal*, 129 S. Ct. at 1949. The plaintiff must plead specific facts, not merely conclusory allegations, to avoid dismissal. *Collins v. Morgan*

-4-

*Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

Dismissal under Rule 12(b)(6) is proper not only where the plaintiff fails to plead sufficient facts to support a cognizable legal theory, but also where the plaintiff fails to allege a cognizable legal theory. *Kjellvander v. Citicorp*, 156 F.R.D. 138, 140 (S.D. Tex. 1994), *citing Garrett v. Commonwealth Mortgage Corp.*, 938 F.2d 591, 594 (5th Cir. 1991); *ASARCO LLC v. Americas Min. Corp.*, 832 B.R. 49, 57 (S.D. Tex. 2007). "A complaint lacks an 'arguable basis in law' if it is based on an indisputedly meritless legal theory' or a violation of a legal interest that does not exist." *Ross v. State of Texas*, Civ. A. No. H-10-2008, 2011 WL 5978029, at *8 (S.D. Tex. Nov. 29, 2011).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *Great Plains Trust Co v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)("District courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004)("Leave to amend should

-5-

be freely given, and outright refusal to grant leave to amend
without a justification . . . is considered an abuse of
discretion. [citations omitted]"). The court should deny leave to
amend if it determines that "the proposed change clearly is
frivolous or advances a claim or defense that is legally
insufficient on its face . . . ." 6 Charles A. Wright, Arthur R.
Miller & Mary Kay Kane, *Federal Practice and Proc.* § 1487 (2d ed.
1990).

"Rule 12(b) is not a procedure for resolving contests
about the facts or the merits of a case." *Gallentine v. Housing
Authority of City of Port Arthur, Tex.*, ___ F. Supp. 2d ___, Civ.
A. No. 1:12-CV-417, 2013 WL 244651, *3 (E.D. Tex. Jan. 22, 2012),
*citing* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice
and Procedure:  Civil 2d* § 1356, at 294 (1990).

As noted, on a Rule 12(b)(6) review, although generally
the court may not look beyond the pleadings, the Court may examine
the complaint, documents attached to the complaint, and documents
attached to the motion to dismiss to which the complaint refers
and which are central to the plaintiff's claim(s), as well as
matters of public record. *Lone Star Fund V (U.S.), L.P. v.
Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010), *citing
Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341,
1343 n.6 (5th Cir. 1994). *See also United States ex rel. Willard
v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir.
2003)("the court may consider . . . matters of which judicial
notice may be taken"). Taking judicial notice of public records
directly relevant to the issue in dispute is proper on a Rule

-6-

12(b)(6) review and does not transform the motion into one for summary judgment. *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011).  "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

**B.  Rule 9(b)**

Federal Rule of Civil Procedure 9(b) provides,

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person must be averred generally.

"In every case based upon fraud, Rule 9(b) requires the plaintiff to allege as to each individual defendant 'the nature of the fraud, some details, a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants." *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 291 (S.D. Tex. 2001).

Unlike the alleged fraud, Rule 9(b) allows a plaintiff to plead intent to deceive or defraud generally.  Nevertheless a mere conclusory statement that the defendant had the required intent is insufficient; the plaintiff must set forth specific facts that raise an inference of fraudulent intent, for example, facts that show the defendant's motive. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)("Although scienter may be averred generally, case law amply demonstrates that pleading scienter requires more than a simple allegation that

a defendant had fraudulent intent.  To plead scienter adequately, a plaintiff must set forth specific facts that support an inference of fraud."); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994).

The particularity requirement of Rule 9(b) also governs a conspiracy to commit fraud.  *Southwest Louisiana Healthcare System v. MBIA Ins. Corp.*, No. 05-1299, 2006 WL 1228903, *5 & n.47 (W.D. La. May 6, 2006); *Hernandez v. Ciba-Geigy Corp. USA*, No. Civ. A. B-00-82, 2000 WL 33187524, *4 (S.D. Tex. Oct. 17, 2000)("The weight of Fifth Circuit precedent holds that a civil conspiracy to commit a tort that sounds in fraud must be pleaded with particularity."); *In re Ford Motor Co. Vehicle Paint Litigation*, No. MDL 1063, 1994 WL 426548, *34 (E.D. La. July 30, 1996); and *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 961 (5th Cir. 1994).

The Fifth Circuit, although construing Rule 9(b) strictly, has recognized an exception and permits the requirements to be "relaxed" where facts relating to the fraud are "peculiarly within the perpetrator's knowledge"; then the alleged fraud "may be pled on information and belief, provided the plaintiff sets forth the factual basis for his belief." *United States ex rel. Russell v. EPIC Healthcare Management Group*, 193 F.3d 304, 308 (5th Cir. 1999), *citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)(warning that the exception "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.").  The relaxed standard is not applicable where the information is available from

another source or where the plaintiff fails to allege a factual
basis for his beliefs. *Sealed Appellant I v. Sealed Appellee I*,
156 Fed. Appx. 630, 634 (5th Cir. 2005)(plaintiff must allege
sufficient factual basis for his belief defendant committed fraud,
e.g., particular documents containing false statements, identified
by number, date or otherwise, or explain how he tried, but failed
to obtain the information, whom he contacted, etc.).

A dismissal for failure to plead with particularity in
accordance with Rule 9(b) is treated as a Rule 12(b)(6) dismissal
for failure to state a claim. *Lovelace v. Software Spectrum,
Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). If it appears that given
an opportunity to amend the pleading, the plaintiff would be able
to state a claim upon which relief could be granted, the court
should grant leave to amend. *People's Choice Home Loan, Inc. v.
Mora*, No. 3:06-CV-1709-G, 2007 WL 708872, *4 (N.D. Tex. Mar. 7,
2007), *citing Kennard v. Indianapolis Life Ins. Co.*, 420 F.
Supp.2d 601, 608-09 (N.D. Tex. 2006).

**C.   The Exchange Act and the PSLRA's Heightened Pleading
Requirements**

The PSLRA heightened the particularity requirements to
plead securities fraud in two ways:   (1) the plaintiff must
"specify each statement alleged to have been misleading and the
reason or reasons why the statement is misleading . . .," 15
U.S.C. § 78u-4(B)(1)(B); and (2) for "each act or omission
alleged" to be false or misleading, the plaintiff must "state with
particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind," 15 U.S.C. § 78u-

4(b)(2).   *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2007).  Rule 9(b) requires the plaintiff in a securities fraud suit to "'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'"   *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004), *quoting Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997).  *See* 15 U.S.C. § 78u-4.  In other words, "'[p]leading fraud with particularity in this circuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'"  *Williams*, 112 F.3d at 177 (5th Cir. 1997), *quoting Tuchman*, 14 F.3d at 1068.  "'In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.'"   *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006), *quoting United States ex. rel. Riley v. St. Luke's Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004).  These facts "must be laid out before access to the discovery process is granted."  *Williams*, 112 F.3d at 178.

The Fifth Circuit does not permit group pleading in securities fraud suits.  *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015), *citing Southland*, 365 F.3d at 365 ("[T]he PSLRA requires the plaintiffs to distinguish among those they sue and

enlighten *each defendant* as to his or her particular part in the alleged fraud. . . . [W]e do not construe allegations contained in the [second amended complaint] against 'defendants' as a group as properly imputable to any particular defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").[6]  Group pleading or group publishing doctrine fails to satisfy the heightened pleading standards of the PSLRA.  *Southland*, 365 F.3d at 363 n.9.

## II.  Relevant Substantive Law

**Exchange Act and the PSLRA**

"[T]o state a claim under section 10(b) of the 1934 [Exchange] Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact[7] (3) made with

_____

[6]  The group pleading or group publishing doctrine permits plaintiffs to presume that statements in prospectuses, registration statement, annual reports, press releases, etc. are collectively attributable to persons with direct involvement in the regular business of the company.  *Southland*, 365 F.3d at 363 n.9.  In its most expansive form it allows "unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate title.  Under this doctrine, the plaintiff need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission where the defendants are 'insiders or affiliates' of the company."  *Id*. at 363.

[7]  In *Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1191, 1196-97 (2013), the Supreme Court held that plaintiffs do not have to prove materiality at the class certification stage in a securities fraud suit based on a fraud on the market theory because Federal Rule of Civil Procedure 23(b)(3) requires only that common questions "predominate over questions affecting only individual members" and materiality is a question common to all putative class members.  There is no requirement that materiality be resolved on the merits before class certification.  *Id.*

scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury.'"  *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001), *quoting Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).  *See also Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)(to state a claim that a defendant made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant;  (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.").   The PSLRA, 15 U.S.C. § 78u-4(b)(1) mandates,

> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
>> (A) made an untrue statement of a material fact; or
>>
>> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which that belief is formed.

*See, e.g., ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002).

An untrue statement is "material" under section 10(b) of the Exchange Act and Rule 10b-5[8] if there is a "'substantial likelihood that' the false or misleading statement 'would have been viewed by the reasonable investor as having altered the 'total mix' of information made available,'" or in other words,

---

[8] Rule 10b-5, adopted by the SEC pursuant to its authority under section 10(b) of the Exchange Act, 15 U.S.C. 10(b)-5.§ 78j(b), states,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice or course of business which operates as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

It forbids three kinds of fraud when they are "material" (when there is "a substantial likelihood that the [statement or omission] . . . would have been viewed by the reasonable investor has having significantly altered the 'total mix' of information available", *Basic*, 485 U.S. at 231-32): misstatements, misleading statements, and omissions (silence) when there is a duty to disclose. 17 C.F.R. § 240.10b-5. Although the Exchange Act does not provide for a private cause of action for § 10(b) violations, the Supreme Court has held that a right of action is implied in the language of the statute and its implementing regulation. *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 & n.9 (1971). Only actual purchasers and sellers of securities have an implied private cause of action under Rule 10b-5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730-31 (1975).

"if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *Nathenson*, 267 F.3d at 418, *quoting Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *R&S Technical Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5ᵗʰ Cir.)(*citing TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)), *cert. denied*, 531 U.S. 817 (2000).

For the "made with scienter" requirement, the PSLRA, 15 U.S.C. § 78u-4(b)(2), states, "In any private action under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Nathenson*, 267 F.3d at 407.  In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976), without determining if scienter included recklessness, the Supreme Court defined scienter in the context of securities fraud as "'a mental state embracing intent to deceive, manipulate or defraud.'"  Id. at 408.  The Fifth Circuit has since held that "severe recklessness" satisfies the scienter requirement.  *Nathenson*, 267 F.3d at 407, *citing Broad v. Rockwell Intern. Corp.*, 642 F.2d 929, 961-62 (5ᵗʰ Cir. 1981)("'Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to

-14-

the defendant or is so obvious that the defendant must have been aware of it.'"), *quoting Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1039-40 (7th Cir.), *cert. denied*, 434 U.S. 875 (1977).   Plaintiffs may satisfy the scienter requirement by allegations of intentional misconduct or of severe recklessness, which "resembles a slightly lesser species of intentional misconduct." *Nathenson*, 267 F.3d at 408-09.   Circumstantial evidence of such conscious behavior or severe recklessness is sufficient to support a strong inference of scienter. *Id.* at 410, *citing Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195 (1st Cir. 1999)("Congress plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence.").   Usually "'the mere publication of inaccurate accounting figures, or failure to follow GAAP, without more, does not establish scienter.'" *Shaw Group*, 537 F.3d at 534, *quoting Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 264 (5th Cir. 2005).   "To plead scienter adequately, plaintiffs must state with particularity facts giving rise to a strong inference that the party knew that it was publishing materially false information, or that the party was severely reckless in publishing such information." *Id.*   Plaintiffs may not rely on a general assertion that Defendants knew about a particular bribe or a specific accounting violation or internal control problem because of their positions in the company, because they are officers, or because of their day-to-day involvement in the company; instead there must be specific allegations of facts showing that they actually knew about a particular accounting violation, bribe, or

internal control problem. *Abrams*, 292 F.3d at 432; *Fin. Acquisition Partners, LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006); *Shaw Group*, 537 F.3d 540-41.

In rejecting the Second Circuit's "motive and opportunity" pleading standard, the Fifth Circuit has concluded, "What must be alleged is not motive and opportunity as such, but particularized facts giving rise to a strong inference of scienter. Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but it would seem to be a rare set of circumstances indeed where those allegations alone are both sufficiently persuasive to give rise to a scienter inference of the necessary strength and yet at the same time there is no basis for further allegations also supportive of that inference." *Id.* at 412. In evaluating whether pleaded facts give rise to a strong (i.e., "a powerful or cogent") inference of scienter, the court must "assess all the allegations holistically," following a three-step procedure "geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 326, 322 (2007). As the first step, the court accepts factual allegations in the pleadings as true; second, the court must review the entire complaint, including documents incorporated by reference and matters of which the court should take judicial notice; and third, the court must consider all plausible inferences, both supporting and opposing a strong inference of scienter. *Id.* at 322-23 ("The inquiry is inherently comparative:

-16-

How likely is it that one conclusion, as compared to others, follows from the underlying facts."). To be a "strong" inference of scienter an inference must be more that merely plausible or reasonable under the *Iqbal* standard; it will survive a motion to dismiss "only if a reasonable person would find it cogent and at least as compelling an any opposing inference that could be drawn from the facts alleged," taken collectively. *Id.* at 324 "The inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences.' . . . Yet the inference must be more than merely 'reasonable' or permissible'--it must be cogent, thus strong in light of other explanations." *Id.* at 324 (citations omitted)(holding that "[a] complaint will survive . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."). Circumstantial evidence can support a strong inference of scienter. *Nathenson*, 267 F.3d at 410.

The Fifth Circuit has held that "'pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company.'" *Shaw Group,* 537 F.3d at 535, *quoting Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2001).

If the plaintiff fails to satisfy this scienter requirement, the district court "'shall," on defendant's motion, 'dismiss the complaint.'" *Id.* at 407*, citing* § 78u-4(b)(3).

Finally, regarding the reliance element in section 10(b) of the Exchange Act and Rule 10b-5, the Fifth Circuit opined in

*Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1117–18 (5th Cir. 1988), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989),

> "The element of reliance is the subjective counterpart to the objective element of materiality.  Whereas materiality requires the plaintiff to demonstrate how a 'reasonable' investor would have viewed the defendants' statements and omissions, reliance requires a plaintiff to prove that it *actually* based its decisions upon the defendants' misstatements or omissions.  'Reliance is *causa sine qua non*, a type of "but for" requirement:  had the investor known the truth he would not have acted." *Huddleston [v. Herman and MacLean*, 640 F.2d 534[, 549] (5th Cir. 1981), *rev'd in part on other grounds*, 459 U.S. 375 . . .  (1983).

*Nathenson*, 267 F.3d at 414, *quoting Abell*, 858 F.2d at 1117–18. "Reliance, in other words, generally requires that the plaintiff have known of the particular misrepresentation complained of, have believed it to be true and because of that knowledge and belief purchased or sold the security in question." *Id.*  Proof of reliance is necessary to establish a "'proper connection between a defendant's misrepresentation and a plaintiff's injury.'" *Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1192 (2013), *citing Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 2179, 2184 (2011).

Because the Supreme Court determined that requiring direct proof of individualized reliance "would place an unnecessarily unrealistic evidentiary burden on [a] plaintiff who has traded in an impersonal market," and "effectively would" prevent plaintiffs "from proceeding with a class action" under Rule 23(b)(3), in *Basic, Inc.*, 485 U.S. at 241-42, 245, the

Supreme Court approved of a rebuttable presumption of classwide reliance by recognizing the "fraud-on-the-market theory" in an efficient market.  As an alternative and practical way to balance "the substantive requirement of proof of reliance in securities cases against the procedural requisites of Federal Rule of Civil Procedure 23 and to meet the reliance requirement, the theory presumes that potentially significant, publicly distributed information is reflected in the price of a stock.  The high court described it succinctly as follows:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than a case of direct reliance on misrepresentations." *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (CA3 1986).

Id. at 989.  See *also Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1192 (2013)("In *Basic*, we held that if a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities.").  "[A] plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case:  (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the

misrepresentation was made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014). The presumption can be rebutted by "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," e.g., that "the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Id.* The high court explained that "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Basic, Inc.* at 242. Where a case depends on the "fraud-on-the-market" presumption, "the complained of misrepresentation or omission [must] have actually affected the market price of the stock." *Nathenson*, 267 F.3d at 415.

Under the PSLRA plaintiffs bear the burden of showing that the defendants' act or omission caused the economic loss for which plaintiffs seek to recover damages. 15 U.S.C. § 78u-4(b)(4). Under Rule 10b-5 Plaintiffs must allege proximate causation as well as economic loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005).[9] Artificially inflated purchase price,

---

[9] At times courts consider the reliance element of a Rule 10b-5 action to be part of the causation element. In this contest, "transaction causation " refers to the requirement that the defendant's fraud must precipitate the investment decision. .

by itself, will not constitute or proximately cause the requisite
economic loss because at the time of purchase, plaintiff has not
suffered a loss because the price is offset by ownership of the
share at that time and because any link between the inflated price
and any later economic loss is usually weak.  *Id.* at 342.[10]  While
the Supreme Court did not discuss what must be pleaded to
establish the causation and economic loss elements, it generally

---

. . . On the other hand, 'loss causation' refers to a direct causal
link between the misstatement and the client's economic loss."
*Huddleston v. Herman and MacLean*, 640 F.2d 534, 549 n.24 (5th Cir.
1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983).  In
contrast, reliance means that the plaintiff knew of a particular
misrepresentation that he complained of, believed it to be true,
and because of that knowledge and belief purchased or sold the
security at issue.  *Nathenson*, 267 F.3d at 413.

[10] The Supreme Court explained,

[I]f . . . the purchaser sells the shares
quickly before the relevant truth begins to
leak out, the misrepresentation will not have
led to any loss.  If the purchaser sells
later after the truth makes its way into the
marketplace, an initially inflated purchase
price *might* mean a later loss.  But that is
far from inevitably so.  When the purchaser
subsequently resells such shares, even at a
lower price, that lower price may reflect,
not the earlier misrepresentation, but
changed economic circumstances, changed
investor expectations, new industry-specific
or firm-specific facts, conditions, or other
events, which taken separately or together
account for some or all of that lower price.
(The same is true in respect to a claim that
a share's higher price is lower than it would
otherwise have been . . . .)  Other things
being equal, the longer the time between
purchase and sale, the more likely that this
is so, i.e., the more likely that other
factors caused the loss. . . . [T]he most
logic permits us to say is that the higher
purchase prices will *sometimes* play a role in
bringing about a future loss.

-21-

stated that the complaint must provide defendants "with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation." *Id.* at 347.

The Fifth Circuit has opined that under *Dura Pharmaceuticals* and *Twombly,* the plausibility standard in Rule 8(a) would apply to pleading causation and economic loss. *Public Employees Retirement System of Mississippi, Puerto Rico Teachers Retirement System v, Amedisys, Inc.*, 769 F. 3d 313, 320 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2892 (2015). The Fifth Circuit has held that to demonstrate loss causation,

> [T]he plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate, and, thereby, proximately caused the plaintiff's economic harm. Loss causation in fraud-on-the-market cases can be demonstrated circumstantially by '(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the fact finder can infer that it is *more probable than not* that it was the corrective disclosure--as opposed to other possible depressive factors--that caused at least a 'substantial' amount of price drop."

*Id.* at 320-21, *quoting FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1311-12 (11th Cir. 2011). The corrective disclosure may be comprised of "a series of partial disclosures." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009). *See also Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir.

-22-

2004)(In demonstrating reliance and loss causation, "plaintiffs cannot trigger the presumption or reliance by simply offering evidence of any decrease in price following the release of negative information.  Such evidence does not raise an inference that the stock's price was actually affected by an earlier release of positive information.  To raise an inference through a decline in stock price that an earlier false, positive statement affected a stock's price, the plaintiffs must show that the false statement causing the increase was related to the statement causing the decrease.").  In the Fifth Circuit, "the testimony of an expert-- along with some kind of analytical research or event study--is required to show loss causation." *Fener v. Operating Engineers Const. & Misc. Pension Fund (Local 66)*, 579 F.3d 401, 409 (5th Cir. 2009).  Nevertheless, opined the Fifth Circuit, "[N]either *Fener* not *Halliburton* even considers whether internal non-public disclosures from Defendants can provide the basis for establishing loss causation.  As such, these cases do not disturb the established principle that proof of loss causation in the context of a fraud-on-the-market regiment is drawn from public data and public filings." *In re TETRA Technologies, Inc. Sec. Litig.*, Civ. A. No. 4:08cv0965, 2010 WL 1335431, at *3 (Bnkrty. S.D. Tex. Apr. 5, 2010)(finding the Fifth Circuit's "bar for demonstrating loss causation" to be "a high one" and allowing additional merits discovery as a matter of law prior to submission of Plaintiff's expert report and seeking class certification).  Plaintiffs in a private securities fraud suit do not have to prove loss causation (i.e., that the defendant's deceptive conduct caused the

investors' claimed economic loss) before they can obtain class certification. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398*, abrogating Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007)(holding that plaintiffs must prove defendants' alleged misrepresentations were the proximate cause of their economic loss to qualify for class certification).

As to the requirement that an allegation of a statement or omission "made on information and belief" requires that the complaint "state with particularity all facts on which that belief is formed," the Fifth Circuit adopts the Second Circuit's interpretation in *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir.), *cert. denied*, 531 U.S. 1012 (2000), which held that "'plaintiffs who rely on confidential sources are not always required to name those sources, even when they make allegations on information and belief concerning false or misleading statements.'" *ABC Arbitrage*, 291 F.3d at 351-54. Observing that "'the applicable provision of the law as ultimately enacted requires plaintiffs to plead only facts and makes no mention of the sources of these facts,'" the Second Circuit in *Novak* held,

> "More fundamentally, our reading of the PSLRA rejects any notion that confidential sources must be named as a general matter. In our view, notwithstanding the use of the word, 'all,' paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiff need only plead with particularity *sufficient* facts to support those beliefs. Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing

that the defendants' statements were false.
Moreover, even if personal sources must be
identified, there is no requirement that they
be named, provided they are described in the
complaint with sufficient particularity to
support the probability that a person in the
position occupied by the source would possess
the information alleged.   In both these
situations, the plaintiffs will have pleaded
enough facts to support their belief, even
though some arguably relevant fact have been
left out.  Accordingly, a complaint can meet
the new pleading requirement imposed by
paragraph (b)(1) by providing documentary
evidence and/or a sufficient general
description of the personal sources of the
plaintiffs' beliefs."

*ABC Arbitrage*, 291 F.3d at 351-52, *quoting Novak*, 216 F.3d at 313-

14.  The Fifth Circuit, *id.* at 352, further quoted *Novak*, 216 F.3d

at 314 n.1:

"Paragraph (b)(1) is strangely drafted.
Reading 'all' literally would produce
illogical results that Congress cannot have
intended.  Contrary to the clearly expressed
purpose of the PSLRA, it would allow
complaints to survive dismissal where 'all'
the facts supporting the plaintiff's
information and belief were pled, but those
facts were patently insufficient to support
that belief.  Equally peculiarly, it would
require dismissal where the complaint pled
facts fully sufficient to support a
convincing inference if any known facts were
omitted.  Our reading of the provision
focuses on whether the facts alleged are
sufficient to support a reasonable belief as
to the misleading nature of the statement or
omission."

The "other facts" can be documentary evidence (for which the

plaintiff specifies the internal report(s), the person(s) who

prepared them, when, which company officer reviewed them) that

"provide[s] an adequate basis for believing that the defendants'

statement or omissions were false or misleading" or "descriptions

of personal sources" with sufficient particularity "to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief." *Id.* at 353. Therefore only "if the other facts, *i.e.*, do not provide an adequate basis for believing that the defendants' statements were false *and* the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief," must the complaint name personal sources. *Id.* at 353. *See also Shaw Group*, 537 F.3d at 535.

Nevertheless in the wake of *Tellabs*, 551 U.S. at 757, which requires comparative weighing of allegations and consideration of plausible nonculpable explanations for a defendant's conduct to determine if there is a cogent and compelling inference of scienter, the Fifth Circuit opined in *Shaw Group.*, *id.* at 535, that

> Following *Tellabs*, courts must discount allegations from confidential sources. *Higginbotham v. Baxter Int'l Inc.*, 495 Fed. 753, 756-57 (7th Cir. 2007).[11]   Such

_____

[11] In *Higginbotham,* a skeptical Chief Judge Easterbrook opined for the unanimous Seventh Circuit panel, concealing names in the complaint "does nothing but obstruct the judiciary's ability to implement the PSLRA. 551 U.S. 564. He continued, "It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." 551 U.S. at 757. While "allegations from 'confidential

> [confidential] sources afford no basis for
> drawing the plausible competing inferences
> required by *Tellabs*. *Id.* at 757 ("*Tellabs*
> requires judges to weigh the strength of
> plaintiffs' favored inference in comparison
> to other possible inferences; anonymity
> frustrates that process."). At the very
> least, such sources must be described "with
> sufficient particularity to support the
> probability that a person in the position
> occupied by the source . . . would possess
> the information pleaded. . . ." *ABC
> Arbitrage Plaintiffs Group v. Tchuruk*, 291
> F.3d 336, 353 (5th Cir. 2002); *see also
> Central Laborers'* [*Pension Fund v. Integrated
> Elec. Services, Inc.*], 497 F.3d [546,] 552
> [(5th Cir. 2007).

See also *Local 731 I.B. of T. Excavators and Pavers Pension Trust

Fund v. Diodes, Inc.*, 67 F. Supp. 3d 782, 788 (E.D. Tex. 2014)

("The Fifth Circuit cautions against reliance on confidential

witnesses, even at the pleading stage. *See [Shaw Group]*, 537 F.3d

at 535. In order to establish the reliability of confidential

witness statements, Plaintiff's allegations must include

'particular job descriptions, individual responsibilities, and

specific employment dates for the witnesses. *See Cent. Laborers'

Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 552

(5th Cir. 2007). But even if described 'with sufficient

particularity to support the probability that a person in the

position occupied by the source . . . would possess the

information pleaded,' the Court discounts allegations based on

confidential witnesses. *ABC Arbitrage*, 291 F.3d at

---

witnesses' must be 'discounted' rather than ignored," the majority
concluded, "Usually that discount will be steep." *Id.*

-27-

353.")(Schneider, J.)[12]; *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 692-93 (S.D. Tex. 2013)(Rosenthal, J.).

Where a plaintiff relies on documentary evidence with company-generated statistics instead of personal sources, the Fifth Circuit followed the Second Circuit's standard in *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 72-73 (2d Cir.), *cert. denied sub nom. Scholastic Corp. v. Truncellito*, 534 U.S. 1071 (2001). *ABC Arbitrage*, 291 F.3d at 356. While declining to require as a threshold requirement in every case that plaintiffs provide details about purported "negative internal reports, such as report titles, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information," the Fifth Circuit did agree that an "'unsupported general claim of existence of confidential company sales reports that revealed the large decline in sales is insufficient to survive a motion to dismiss.'" *ABC Arbitrage*, 291 F.3d at 355-56. A sensible standard pleading on information and belief would require, "beyond bare pleadings," "specifying who prepared the internal company reports, how frequently the reports were prepared and who reviewed them"; it would not require the pleading of detailed evidentiary matter. *Id.* at 356, *quoting Scholastic*, 252 F.3d at 73-74.

---

[12] In *Central Laborers'* the Fifth Circuit concluded that where a confidential source's statements lack sufficient detail "such as particular job descriptions, individual responsibilities, and specific employment dates," there is an insufficient basis to evaluate the information and will not support a strong inference of fraud. 497 F.3d at 552.

Allegations of a conversation between one party's unnamed high ranking official/top executive and a named executive of another is sufficient to meet the *Novak* standard for a source if the unnamed person in such a position would possess the information pleaded and that this executive was the source for the information. *Id.* at 357.

A "forward-looking statement" is defined in 15 U.S.C. § 77z-2(i)(1) in relevant part as:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission . . . .

The PSLRA creates a safe harbor for forward looking statements, whether written or oral, under § 78u-5(c)(1) if "(A) the forward-looking statement is--(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (B) the plaintiff fails to prove that the forward-looking statement (i) if made by a natural person was made with actual knowledge by that person that the statement

was false or misleading; or (ii) if made by a business entity:
was--(i) made by or with the approval of an executive officer[13] of
that entity; and (ii) made or approved by such officer with actual
knowledge by that officer that the statement was false or
misleading."  15 U.S.C. § 78u-5(c)(1).  *See generally Southland
Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353,
371-72 (5th Cir. 2004).  "Meaningful" requires "'substantive'
company-specific warnings based on a realistic description of the
risks applicable to the particular circumstances, not merely a
boilerplate litany of generally applicable risk factors."
*Southland*, 365 F.3d at 372.  Oral statements can satisfy the safe
harbor requirements if "(i) the statement is accompanied by a
cautionary statement that the 'particular' oral statement is
forward-looking and that actual results could differ materially .
. .; (ii) the statement is accompanied by an oral statement that
additional information that could cause actual results to differ
materially is contained in a readily-available document; (iii) the
statement identifies the document or portion thereof containing
the additional information; and (iv) the identified document
itself contains appropriate cautionary language.  *Id., citing* 15
U.S.C. §§ 77z-2(c)(2), 77u-5(c)(2).  Such readily available

---

[13]  For purposes of the Exchange Act and the rules
promulgated under it, "[t]he term 'officer' means a president,
vice president, secretary, treasurer or principal financial
officer, comptroller or principal accounting officer, and any
person routinely performing corresponding functions with respect
to any organization whether incorporated or unincorporated."  17
C.F.R. 240.3b-2.

documents can include those filed with the SEC or generally disseminated. *Id., citing* §§ 77z-2(c)(3), 77u-5(c)(3).

Nor do statements of material fact include puffery, i.e., generalized, positive statements about the company's competitive strengths, experienced management, and future prospects that are too vague, optimistic, and lacking in concrete factual or material misrepresentations to support a securities fraud claim. *Southland*, 365 F.3d at 372, *citing inter alia Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). No reasonable investor would rely on such obviously false or misleading statements. *Rosenzweig*, *id.*

In order to prevent costly discovery until the court can determine whether a filed securities fraud suit has merit, with two rare exceptions the PSLRA instituted an automatic, mandatory stay of discovery in 15 U.S.C. § 78u-4(b)(3)(B), which provides,

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

*See, e.g., Davis v. Duncan Energy Partners, LP*, 802 F. Supp. 2d 589 (S.D. Tex. 2011)(Lake J.).

Rule 10b-5's implied private right of action does not apply to suits against aiders and abettors. *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 131 S. Ct. 2296, 2302-03 (2011), *citing Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), and

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 152-53 (2008). Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, imposes a derivative liability on persons who control those primarily liable under the Exchange Act and those who aid and abet them:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

For a violation of § 20(a), a plaintiff must show (1) an underlying, primary violation of § 10(b) of the Exchange Act and Rule 10b-5 and (2) direct or indirect control of the violator by the defendant. *Southland*, 365 F.3d at 383-84. The plaintiff bears the burden of establishing control, while the defendant bears the burden of proving a good faith affirmative defense; therefore, for a *prima facie* case of control person liability, the plaintiff is not required to plead facts showing that the defendant acted in bad faith. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 598 (S.D. Tex. 2003), *citing G.A. Thompson & Co. v. Partridge*, 626 F.2d 945, 958 & nn. 22 and 23 (5th Cir. 1981). Pleading standards for claims for control person liability are relaxed: the heightened pleading standards of Rule 9(b) do not apply, as neither fraud nor scienter is an element of such a claim. *On Longhorn Land I, LP v. Defendant FF*

-32-

*Arabian LLC*, No. 4:15cv203-RC-CMC, 2015 WL 7432360, at *2 (E.D. Tex. Nov. 23, 2015).  Moreover in the Fifth Circuit the plaintiff only has to allege that the defendant possessed the power to control the primary violator, not that he exercised that power. *In re Enron Corp. Sec.*, *Derivative & ERISA Litig.*, Civ. A. No. H-01-3624, 2004  WL 764664, at *5 (S.D. Tex. Mar. 31, 2004).

Control person liability is derivative:  if a plaintiff fails to state a claim for a primary violation of section 10(b) or Rule 10b-5, any claim for control person liability fails. *ABC Arbitrage*, 291 F.3d at 348 n.57; Thomas Lee Hazan, *The Law of Securities Regulation* § 13.15 (1990).

## B.  FCPA

The FCPA is both a civil and a criminal statute. Penalties for knowingly violating the FCPA can be civil and criminal and include monetary penalties and imprisonment.  15 U.S.C. § 78ff.  The U.S. Sentencing Guidelines are used to determine the criminal penalty range.[14]  The application of these

---

[14] *See* David E. Dworsky, *Foreign Corrupt Practices Act*, 40 Am Crim. L. Rev. 671, 688  (Spring 2009)(footnotes omitted) describes the punishment for individuals violating the FCPA:

> Sentencing for individual who violate the FCPA's accounting provisions are determined under section 2B1.1 of the Guidelines, which includes fraud sentencing provisions. Factors that may increase the offense level include committing a substantial part of a scheme from outside the United States or substantially jeopardizing the safety and soundness of a financial institution.  The FCPA statutory provisions state that individuals who willfully violate the FCPA accounting provisions may be fined up to $5,000,000 and imprisoned for up to twenty years.

Guidelines will lower a corporate fine if the corporation
"'reported the offense to appropriate governmental authorities,
fully cooperated in the investigation, and clearly demonstrated
recognition and affirmative acceptance of its responsibility for
its criminal conduct.'"   Mike Koehler, *The Facade of FCPA
Enforcement*, 41 Fed. J. Int'l L. 907, 927 ((Summer 2010), *quoting
U.S. Sentencing Guidelines Manual* § 8C2.5(g)(2009).

      The FCPA, an amendment to the Exchange Act,[15] contains
both (1) anti-bribery provisions and (2) auditing and accounting
provisions, the latter comprised of (a) the "books and records"
provision and (b) the "internal controls" provisions.   The
Department of Justice ("DOJ") and the SEC share enforcement

---

        Bribery sentences for individuals are
determined under section 2B4.1 of the
Guidelines.   Individuals who willfully
violate the bribery provisions may receive no
more than a $100,000 fine and five years in
prison under the FCPA, although application
of the alternative fines provisions of the
Sentencing Reform Act has resulted in higher
penalties.

For corporations he explains, *id.* at 688-89,

        Sentencing of corporations that have violated
the FCPA is determined under Chapter Eight of
the Guidelines.   Under Chapter Eight, an
effective compliance program will reduce the
culpability score, while the participation of
high-level officials in the illegal action
will raise the culpability score.

        Under the Act, the maximum penalty for
corporations for willful violations of the
FCPA accounting provisions is $25,000,000.
The maximum corporate liability for breach of
the anti-bribery provisions is $2,000,000.

      [15] Pub. L. No. 95-231, 91 Stat. 1495 (1977)(codified as
amended at 15 U.S.C. §§ 78m, 78dd-1 to -3 (2012).

authority for both.  The anti-bribery provisions are criminally enforced by the DOJ with criminal penalties over "issuers" (public companies) and their officers, directors, employees, agents or stockholders acting on the company's behalf, while the DOJ also enforces both criminally and civilly the anti-bribery provisions over "domestic concerns," i.e., those including "(a) U.S. citizens, nationals, and residents and (b) U.S. businesses and their officers directors, employees, agents or stockholders acting on the domestic concern's behalf—and certain foreign persons and businesses that act in furtherance of an FCPA violation while in the territory of the United States." *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at p.4, put out by the DOJ and the SEC on November 14, 2012 ("DOJ/SEC *Resource Guide*"), available at www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf).  The SEC is responsible for civil enforcement of the FCPA.  *Id.* at pp. 4-5.

The FCPA controls bribery by (1) prohibiting any U.S. citizen (individual or corporate) from bribing a foreign official, 15 U.S.C. § 78dd-1; and (2) establishing record-keeping rules for issuers of securities of publicly held corporations registered under the Exchange Act, 15 U.S.C. § 78m(b)(2).  The latter (2) is composed of two categories:  (1) the issuers are required to "make and keep books, records and accounts which, in reasonable detail,[16] accurately and fairly reflect the transactions and dispositions of the issuer," §78m(b)(2)(A), and (2) the issuers must "devise and

---

[16] "Reasonable detail is "such level of detail . . . as would satisfy prudent officials in the conduct of their own affairs." § 78m(b)(7).

maintain a system of internal accounting controls sufficient to provide reasonable assurances of compliance," § 78m(b)(2)(B). "Records" under § 78m(b)(2)(A) include "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language."   25 U.S.C. § 78c(a)(37).   There is no scienter requirement for record-keeping violations under § 13 of the Exchange Act, 15 U.S.C. § 78m(b)(2).

More specifically, the anti-bribery provisions of the FCPA, 15 U.S.C. § 78dd-1(a),[17] prohibit issuers of registered

---

[17] In whole, § 78dd-1(a)(Prohibition) states,

It shall be unlawful for any issuer which has a class of securities registered pursuant to section 78l of this title or which is required to file reports under section 78o(d) of this title, or for any officer, director, employee, or agent of such issuer or any stockholder thereof action on behalf of such issuer, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to--

(1) any foreign official for purposes of--

(A)(i) influencing any act or decision of such foreign official in his official capacity (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage; or

(B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

securities from attempting to influence foreign officials by offering, promising, or giving "anything of value" to a foreign official to secure "any improper advantage" "in order to assist that issuer in obtaining or retaining business for or with, or directing business to, any person," i.e., in other words bribe a foreign official to obtain or retain business. 15 U.S.C. §§ 78dd-1(a) and 78dd-2(a). *See, e.g., Midwestern Teamsters Pension Trust Fund v. Baker Hughes, Inc.*, Civ. A. No. H-08-1809, 2009 WL 6799492, at *1 (S.D. Tex. May 7, 2009). A "foreign official" is broadly defined as "any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency or instrumentality, or for or on behalf of any such public international agency." *Id.* § 78dd-1(f)(1)(A).

From 1977 to 1979 the SEC mainly focused on anti-bribery provisions of § 78dd-1(a)(1), but subsequently it has focused its enforcement proceedings on the books and records provision, section 13(b)(2)(A), as amended, 15 U.S.C. § 78m(b)(2)(A) violations, and on the internal controls provisions, § 78m(b)(2)(B) that breach the statute's two requirements: "(1) a company must keep accurate books and records reflecting the transactions and dispositions of the assets of the issuer, and (2) a company must maintain a reliable and adequate system of internal

---

in order to assist such issuer in obtaining or retaining business for or with, or directing business to, any person.

-37-

accounting controls." *SEC v. World-wide Coin Investments, Ltd.*, 567 F. Supp. 724, 748 (N.D. Ga. 1983). The "books and records" provision, section 13(b)(2)(A) of the FCPA, provided the SEC with complete authority over the financial management and reporting requirements of publicly held United States corporations. *World-wide Coin*, 567 F. Supp. at 746. The FCPA also imposes accounting controls for companies subject to either the registration or the reporting provisions of the Exchange Act. *Midwestern Teamsters*, 2009 WL 6799492, at *1. Observing that "investors are entitled to rely on the implicit representations that corporations will account for their funds properly and will not channel funds out of the corporation or omit to include such funds in the accounting system so there are no checks possible on how much the corporation's funds are being expended in the manner management later claims," the Honorable Robert L. Vining quoted Section 13(b)(2) of the FCPA to demonstrate the internal accounting controls on every issuer having a class of securities registered pursuant to section 12 of the Exchange Act, *id.*:

> "(a) Make and keep books, records, and accounts which, in reasonable detail,[18] accurately[19] and fairly reflect the transactions and dispositions of the assets of the issuer; and

---

[18] "Reasonable detail" is defined as "such level of detail and degree of assurance as would satisfy prudent officials in the conduct of their own affairs." 15 U.S.C. § 78m(b)(7).

[19] "Accurately" does not mean with exact precision; the records should "reflect transactions in conformity with generally accepted accounting principles or other applicable criteria." S. Rep. No. 95-114, S. Rep. No. 114, 95th Cong., 1st Sess. 1977, 1977 U.S.C.A.A.N. 4098, 1977 WL 16144 (Leg. Hist.) at 8 (1977)

(b) Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that

(i) transactions are being executed with management's general or specific authorization;

(ii) transactions are recorded as necessary (l) to permit preparation of financial statements in conformity with generally accepted accounting principles, and (ll) to maintain accountability for assets;

(iii) access to assets is permitted only in accordance with management's general or specific authorization; and

(iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences ....

An "issuer's" books and records for purposes of accounting control requirements include those of the subsidiaries and affiliates under its controls, including foreign subsidiaries and joint ventures.   DOJ/SEC *Resource Guide* at p. 43.

Section 13(b)(2) of the FCPA and the rules promulgated under it "are rules of general application which were enacted to (1) assure that an issuer's books and records accurately and fairly reflect its transactions and the disposition of assets, (2) protect the integrity of the independent audit of issuer financial statements that are required under the Exchange Act, and (3) promote the reliability and completeness of financial information that issuers are required to file with the Commission or

disseminate to investors pursuant to the Exchange Act." *World-wide Coin*, 567 F. Supp. at 747.[20]

In *In re Nature's Sunshine Products Securities Litigation*, 486 F. Supp. 2d 1301 (D. Utah 2007), a court recognized for the first time control person liability in the context of an FCPA enforcement action.

Here the FCPA allegations, which cite ever increasing enforcement actions by the SEC and the DOJ in recent years, in Lead Plaintiff's view serve to show the heightened risk of Key's investment and of doing business in Mexico and Russia, as well as misrepresentations by Defendants, given Key's repeated statements that Key fully complied with FCPA provisions, yet its internal controls were so inadequate as to "underscore[], at minimum, the gross recklessness with which Defendants misled investors." #37 at ¶¶ 5-6. Lead Plaintiff asserts that ultimately Key revealed that the SEC was investigating Key for potential FCPA violations in its Russian operations, with the result that Key's share price and the company suffered significant economic loss. *Id.* at ¶¶ 9-

---

[20] The rules promulgated under section 13(b)(2) are the following: Rule 13b2-1 provides "No person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act; and Rule 13b2-2 states, "No director or officer of an issuer shall, directly or indirectly, (a) make or cause to be made a materially false or misleading statement or (b) omit to state, or cause another person to omit to state any material fact necessary to make statements made, in light of the circumstance under which such statements were made, not misleading to an accountant in connection with (1) any audit or examination of the financial statements of the issuer required to be made pursuant to this subpart or (2) the preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise." *World-wide Coin*, 567 F. Supp. at 747-47.

13.  The complaint states that because of this SEC's investigation of its Russian operations, "Key discovered potential FCPA violations in Mexico that required self-disclosure to both the DOJ and SEC, and that Key recorded a massive impairment to goodwill and other assets at its Russia reporting unit." #37 ¶ 73.

There is no implied private right of action under the FCPA. *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024 (6th Cir. 1990)(relying on *Cort v. Ash*, 422 U.S. 66, 78 (1975)), *cert. denied*, 498 U.S. 1086 (1991); *J.S. Service Center Corp. v. Gen. Elec. Technical Services Co., Inc.*, 937 F. Supp. 216 (S.D.N.Y. 1996); *Lewis on Behalf of Nat. Semiconductor Corp. v. Sporck*, 612 F. Supp. 1316 (N.D. Cal. 1985); *Scientific Drilling International, Inc. v. Gyrodata Corp.*, 215 F.3d 1351 (table of Decisions without Reported Opinion), Nos. 99-1077, 99-1084, 1999 WL 674511, at *3-4 (Fed. Cir. Aug. 30. 1999)(concluding that "the Fifth Circuit would likely follow the Sixth Circuit's decision in *Lamb*").

## III.  Allegations of the Consolidated Amended Complaint (#37)

With the continuing downturn in its domestic oil and gas operations, by 15.4% just in 2013, in 2011 Key had begun a couple of years earlier aggressively expanding its international business and subsequently during the Class Period as part of its business and growth strategies, Defendants urged investors to take advantage of international growth opportunities in foreign markets, especially Russia and Mexico, even though these operations involved high risk because of substantial official corruption, inadequate rule of law, and a lack of transparency in the accounting/bookkeeping.

In its 2009 Form 10-K, filed with the SEC on February 26, 2010, Key reported that in the United States in 2009, it had "1.8 million rig hours and 1.7 million trucking hours, which was a decrease of 35.2% and 28.2%, respectively, from 2008 activity levels and 28.1% and 24.8%, respectively from 2007 activity levels." #37, ¶ 14. At the same time, it reported this decline as offset by "our expansion into Mexico and Russia during 2009, and the full year effect of acquisitions completed during 2008." *Id.* It further stated that it expected Petroleos Mexicanos ("PEMEX"), Mexico's state-owned oil company and Key's biggest international client, "will maintain their level of workover activity and that the rigs we have currently operating in Mexico will be utilized for all of 2010." *Id.*

In its 2010 Form 10-K, filed with the SEC on February 28, 2012, Key emphasized the significance of its international expansion, pointing out that the revenues for its Well Servicing segment increased 14% over 2009, attributable to "international expansion, improved pricing and additional revenues from 2010 acquisitions, offset by lower revenues attributable to our operations in Mexico due to a decrease in work for [PEMEX]." #37 at ¶ 36. It also stated that in 2009, while revenues in that same segment fell significantly because of commodity prices and the financial crisis, "the expansion of our operations in Mexico and incremental rig hours from our Russian joint venture in 2009" partially compensated for this downward trend. *Id.*

Although there was a slowdown in its Mexican operations that year, purportedly caused by budget issues at PEMEX, Key still

predicted continued growth in Mexico in 2011.  #37 at ¶ 37.  In
its 2010 Form 10-K, Key represented that PEMEX had commenced
operations under its 2011 capital budget, and Key's activity
started to increase from its depressed 2010 levels.  Key therefore
stated that it "anticipate[d] strong demand through most of 2011
for our rigs currently deployed in Mexico, primarily in the
Chicontepec region."  *Id.*

     At the Pritchard Capital Energize Conference in San
Francisco, California on January 4, 2012, Whichard reported,
"Internationally our presence continues to grow. . . . As we exit
Q4, we'll have 24 rigs operating in Mexico with PEMEX demanding
more equipment."  #37 at ¶ 38.

     In a press release on February 16, 2012, in announcing
its financial results for the fourth quarter and full year of 2011
Key represented that "[t]he strong improvement in international
results in 2011 was driven by higher rig activity in Mexico . . .
"  #37, ¶ 39.  The next day in a conference call for analysts and
investors, Alario bragged of Key's success in Mexico:  "When we
first entered the Mexico market back in 2007 with three rigs, we
believed then that it could become a 40- to 50 rig market for Key.
I am pleased to report that our activity in Mexico should more
than double in 2012, with at least 40 rigs for the year compared
to an average of 18 rigs in 2011."  *Id.*

     In its Form 10-K for the year 2011, filed with the SEC
on February 29, 2012, Key indicated, "We generate significant
revenue from our contracts with" PEMEX, and "in Mexico we were
awarded two $90 million contracts for work in the Aceite Terciario

-43-

del Golfo ("ATG") field.  The contracts led us to increase our rig count in the country during 2011 with additional rigs planned for the country in 2012, doubling our rig count in the country."  *Id.* at ¶ 41.  In the same document, buttressing its emphasis on the importance of Key's expansion into Mexico, Key noted that while "no single customer accounted for more than 10% of our consolidated revenues" in 2010 or 2011, in the year that "ended December 31, 2009, [PEMEX] accounted for approximately 11% of our consolidated revenues.  No single customer accounted for more than 10% of our consolidated revenues for the year ended December 31, 2009."  At the same time, "[r]eceivables outstanding from [PEMEX] were approximately 10% of our total accounts receivable as of December 31, 2011.  No single customer accounted for more than 10% of our total accounts receivable as of December 31, 2010.  [PEMEX] accounted for approximately 25% of our total accounts receivable as of December 31, 2009.  No other customers accounted for more than 10% of our total accounts receivable as of December 31, 2011 and 2009."  *Id.* at ¶ 42.

Whichard again bragged about Key's Mexican business at the Raymond James Institutional Investors Conference in Orlando, Florida on March 6, 2012, representing that "[o]ur international revenue doubled year-over-year, if you pull Argentina out of the mix.  ***And 80% of our increase came from Mexico and increases in the Middle East as well as Columbia [sic] . . . . PEMEX has a strong demand for additional workovers.  They've asked us to double our presence there.  We did.***"  #37 at ¶ 43 (emphasis in the complaint).

-44-

Key issued a press release on June 26, 2012 announcing second quarter 2012 financial results:  "The **revenue and margin improvement was driven primarily by higher activity in Mexico.**" #37 at ¶ 44 (emphasis in complaint).  Alario stated, "Internationally, our second quarter results improved considerably driven primarily by the full deployment of assets in Mexico where demand for our services continues to grow." *Id.*

In sum, Key represented that its growth was largely based on positive trends in its Mexico operations and that Mexico was driving, and was expected to continue driving, its financial successes.  Despite these optimistic statements, however, the complaint asserts that Key's internal controls were not strong, Defendants' representations were thus not made in good faith, and Defendants were grossly reckless in misleading investors.  #37 at ¶ 45.  Indeed, "had Key's compliance machinery been as developed and stringent as Defendants represented, it would have been impossible for Defendants **not to know** that its success in certain international markets was, at least in part, the result of rampant FCPA violations." *Id.*

The substantial increase in recent years in United States' regulation and enforcement of the FCPA should have given Key ample warning of the need for great vigilance in doing business abroad and for essential internal compliance controls. For instance, on November 16, 2010, Assistant Attorney General Lanny A. Brewer admonished at the 24th National Conference on the FCPA, "FCPA enforcement is stronger than it's ever been--and getting stronger.  We are in an era of FCPA enforcement; and we

are here to stay." #37 at ¶ 57. The severity of penalties for violations also "skyrocketed," and companies worldwide "are now well aware of the increasingly severe criminal and civil penalties imposed by the DOJ and SEC in FCPA cases." *Id.* at ¶ 58. The risks were highly publicized when Key was expanding further into international markets. In 2009 in an article in the International Trade Law[21] Journal Veronica Foley & Catina Haynes warned, "As U.S. Companies move more aggressively into Latin American markets, they quickly learn bribery is often seen as a normal part of the business; however, operating with a 'when in Rome' mentality can easily lead to violations of the [FCPA] and associated sanctions' AND "[a] number of FCPA enforcement actions have recently focused on U.S. business conduct in Brazil, Costa Rica, Argentina, Venezuela, Mexico and Ecuador." #37, ¶ 60. Iris E. Bennett, *Cross Border Issues-Corruption remains a business risk*, National Law Journal (March 31, 2008), wrote, "Latin America, as a whole, and certain countries in particular--including those with the three largest economies, Mexico, Brazil and Argentina--suffer from entrenched public corruption and weak law enforcement." #37, ¶ 61. For additional examples see *id.* ¶62. Warnings about Russian corruption similarly proliferated. See examples, *Id.* at ¶¶ 63-67. Key paid little attention and continued to portray itself as well prepared to deal with the notoriously corrupt Russian and Mexican markets.

---

[21] *The FCPA and Its Impacts in Latin America*, Int'l Trade L.J. 27, 27 (Summer 2009).

Key's Board of Directors adopted a Code of Business Conduct ("Code") with an introductory letter by Alario stating that all Key employees "must commit to always acting lawfully, ethically and with integrity,: and summarizes, "Do the right thing without exception."  #37, ¶¶ 94-95.   The Code "applies to the Company and its subsidiaries and affiliates[,] . . . including all business units in all of our offices and locations around the world[, but] [a]ll employees and officers in the business units are expected to be familiar with the Code and apply it in the daily performance of their work-related responsibilities." *Id.* ¶ 95.   An Ethics Committee (composed of representatives from the Company's Internal Audit, Legal, Human Resources, and Operations departments) and the Board of Directors' Audit Committee monitor and oversee compliance with "applicable laws and regulations." *Id.* ¶ 96.   The Code especially highlights the Audit Committee's oversight role:

> The Audit Committee . . . shall have oversight of the administration of the Code and responsibility for the Ethics and Compliance program within the Company. Significant or material events related to the Company's Ethics & Compliance program shall be reported immediately to the chair of the Audit Committee.  At least once a year, the Ethics Committee or Director-Internal Audit shall report to the Audit Committee regarding the Company's Ethics & Compliance program activities, and of the occurrence of all significant events relating to the Code.

*Id.*  The Code instructs Key employees about limitations on gifts given to governmental officials ("In the U.S., an employee may not give gifts of more than nominal value ($100.00) to an actual or prospective customer, supplier, or contractor of the Company, or

any governmental official, in an attempt to establish dealings
with the Company providing such gifts, without written approval of
the employee's supervisor."), and admonishes they must "[n]ot
offer bribes or accept kickbacks from our suppliers, contractors,
or customers for any reason."   #37 ¶ 97.   It also informs
employees that the FCPA "prohibits payments to foreign officials
for the purpose of obtaining or keeping business" and that under
the FCPA "a 'foreign official' is any officer or employee of an
instrumentality of a foreign government, including state-owned or
controlled energy companies, such as Petroleos Mexicanos, SA
('PEMEX'), as well as political officers and candidates for
political office.   Further description and examples, as well as
instructions for proper transaction of business inside the U.S.
are found on-line in the Company's FCPA Compliance Manual."   #39
¶ 98.

Key's Foreign Corrupt Practices Act Compliance Manual
("FCPA Compliance Manual"), effective June 6, 2008, also contains
an introductory letter signed by Alario:

> It is our policy that the Company, as well as
> each person or entity acting as a
> representative or advisor to the Company,
> shall fully comply with all applicable
> provisions of the FCPA. Employees, officer,
> directors, agents, and representative who
> transact business for the Company
> internationally are expected to understand
> and comply with the provisions in this
> Compliance Manual, to avoid inadvertent
> violations, and to recognize potential issues
> in time for them to be appropriately
> addressed.

#37 ¶ 99.   The Manual is  divided into two parts:  "FCPA Policy"
and "FCPA Procedures."   #37 ¶ 100.

The policy of Key and its subsidiaries and affiliates is that "the Company and each person or entity acting as a representative or advisor to the Company shall fully comply with all applicable provisions of the [FCPA]" and prohibits "use of Company funds or assets for any unlawful, improper or unethical purpose," noting that any "[i]mproper gifts, payments or offerings of anything of value to foreign officials could jeopardize the growth and reputation of the Company, and will not be tolerated." #37 ¶ 101. The FCPA Compliance Manual governs "all financial record-keeping activities to which Key is subject by virtue of the federal and state securities laws, including the U.S. Securities and [*sic*] Exchange Act of 1934." #37 ¶ 102.

The FCPA describes the responsibilities of different parties as follows:

> *Employees.* All Company employees who are involved in any way in transactions in foreign countries, or who work temporarily outside the United States, as well as all employees located in the corporate offices in Midland and Houston, Texas, are required to read and comply with the FCPA Compliance Manual. All international employees who are authorized to expend funds on behalf of the Company (not assigned in field positions) are required to read and comply with the FCPA Compliance Manual.

> *Third Parties*. Agents and representatives of the Company who are involved in any way in transactions in foreign countries, or who work outside the United States are required to read and comply with the FCPA Compliance Manual.

> *Accounting Department*, The Accounting Department shall maintain accounting procedures to ensure that no false or misleading entry is made in the Company's books and records for any reason. The

Accounting Department should also maintain financial reporting and controls to prevent FCPA violations.

*Audit Department.* The Internal Audit Department, in conjunction with the FCPA Compliance Officer, will develop an annual FCPA plan, as approved by the Audit Committee. Internal Audit will implement the audit plan and also perform other random compliance audits as may be requested from time to time by management, the Audit Committee or the FCPA Compliance Officer.

*FCPA Compliance Officer.* Appointed by the Company's General Counsel, the FCPA Compliance Officer will be responsible for the FCPA Compliance Manual, implementing and monitoring the Company's FCPA compliance program, including compliance certifications, and providing training to employees and third parties concerning the FCPA. The FCPA Compliance officer [*sic*] shall also investigate and approve the employment of all foreign agents, any gifts or entertainment with foreign officials, and the commencement of significant business operations outside the United States. The FCPA Compliance Officer shall also investigate any allegations of misconduct.

#37 ¶ 103.   Key's FCPA Policy emphasized, "If the situation warrants a token gift of other than nominal value, the employee must consult with the FCPA Compliance Officer prior to offering such a gift.   The approval of the FCPA Compliance Officer is required to ensure that the gift is consistent with the FCPA, and that the gift is lawful, customary, and necessary to the conduct of business in the country where it is made. . . . Employment of a foreign agent, commencement of significant business operations outside the United States, gifts, or entertainment of a foreign official must all be approved in advance by the FCPA Compliance officer."   #37 ¶ 104.

Last of all, the FCPA Policy "recognizes and emphasizes the importance of anti-corruption training as an essential component of an FCPA compliance program.  To that end, Key will provide FCPA Anti-corruption training, both in person and through web-based programs, periodically at times to be determined by the Company's General Counsel."  #37 ¶ 105.  Any employee who violates the FCPA or the Company's FCPA Policy "will be disciplined and may be terminated.  Intentional violations of the FCPA will result in termination."  *Id.*

In the second half of the FCPA Compliance Manual regarding procedures, the broad definitions of "foreign official" and "anything of value," including with respect to third parties, as well as the need for due diligence and investigation of the "reputation, beneficial ownership, professional capability and experience, financial standing and credibility" and history of compliance of any prospective Representative and any acquisitions and joint ventures, are set out  #37 ¶¶ 106-110.  The procedures require Key's Accounting Department to be responsible for maintaining and enforcing Key's accounting and record keeping policies and Key's Internal Audit Department with auditing Key's compliance with policies state in the Compliance Manual and related policies and procedures constituting its internal control system.  #37 ¶ 111.  The procedures require Key to "maintain a system of internal account controls sufficient to provide reasonable assurances" that

> a.  transactions are executed in accordance with management's general or specific authorization; b. transactions are recorded

as necessary: (i) to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") or any other criteria applicable to such statements; and (ii) to maintain accountability for assets; c. transactions are recorded in the books in accordance and compliance with GAAP, as well as applicable laws and regulations; d. access to Key assets is permitted only in accordance with management's general or specific authorization; and e. the recorded accountability for corporate assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

#37 ¶ 112. The procedures require "[m]onitoring and auditing systems" in place to detect policy violations and review personnel records of those who deal with governmental officials or who submit financial data that affect Key's financial statements or reports. #37 at ¶ 113. Similarly Key's Audit Department must conduct FCPA audits based on an annual FCPA audit plant and must "interview persons responsible for administering, implementing and monitoring Key's compliance program." *Id.*

The complaint asserts that given these accounting and controls were supposedly in place at Key through its Code of Business Conduct and its FCPA Compliance manual, any illegal payments made regarding its Russian or Mexican operations or engagement of any agent, sponsor or third party in connection with any non-U.S. business could not have been made without the knowledge and approval of Key's senior management.

In addition the government has provided companies with clear guidelines on designing and implementing an effective FCPA

program, including the DOJ/SEC *Resource Guide* and the Federal Sentencing Guidelines.

The Consolidated Amended Complaint charges that although Key had compliance programs that looked strong on paper, in actuality Key did not have an effective compliance or training program in effect and therefore "created an atmosphere in which violations of laws and regulations and the Company's own internal policies were ignored" and there were "rampant FCPA violations." #37 ¶ 133. Key did not properly staff its compliance department nor establish effective internal controls and internal audit departments. *Id.* Either Defendants knew or should have known that Key's internal controls were nonexistent or they recklessly disregarded the controls in place. *Id.*

The Consolidated Amended Complaint alleges that six, unidentified confidential witnesses ("CWs") have come forward to testify against Key with regard to its illusory compliance program and its actual FCPA violations. #37 at pp. 1-2. CW2, a Senior Internal Auditor at Key from May 2012 through July 2012, who had worked at several other large public companies and had substantial experience conducting audits both domestically and abroad, even in countries known for having corrupt business cultures,[22] expressed surprise at the absence of internal controls and compliance efforts at Key: "A lot of things were not taken care of . . .

---

[22] #37 at pp. 1-2 states that CW2 "has specific experience with Sarbanes-Oxley and FCPA compliance reviews," and he "reported to William Tobey, Director of Internal Audit, who also reported to defendant Whichard, Key's CFO, and then defendant Dodson, who replaced defendant Whichard as CFO."

.[*Key doesn't have a robust internal control function at all.*"
#37 ¶¶ 134-35. (emphasis in the complaint).

CW6, a Corporate Auditor at Key from May 2011 through
May 2013,[23] and who assisted in fraud investigations and expense
reimbursement reviews, agreed:  "Internal controls are non-
existent . . . *There's no support from the CEO or the CFO for
[that] type of work*."  *Id*.  He further stated, "I don't think
internal audit [at Key] ever audited internationally."  *Id*. at ¶
135.  He also stated that in some international operations it did
not have procedures in place to decide how vendors were chosen and
vetted and who approved their invoices.  *Id*.  The complaint quotes
him:  "You should have in your risk assessment process, done by
someone in management, identifying that FCPA is an issue in x,y,z
countries. . . . And then you have to audit [those countries] this
frequently--once a year, twice a year[, b]ut no, that was not
existent [at Key]."  *Id*.  CW2 agreed with CW6's comments:  "There
is really not a structure in place that would provide a compliance
function. . . . *I never saw a single person mention compliance* [at
Key]."  *Id*. at ¶ 136.  He stated that the internal audit
department was "completely dysfunctional," with a high turnover of
employees and unqualified staff.  *Id*.  When asked about Key's
compliance department, CW6 could not remember its having one.
Both CWs observed that it was problematic that the head of the

---

[23] The complaint states that CW6 in his position as
Corporate Auditor headed operation and business process audits,
and "was also responsible for conducting control tests to confirm
that the Company complied with internal controls over financial
reporting."  #37 at p.2.

internal audit department reported directly to the CFO, when it should report to the Board of Directors' Audit Committee. *Id*.

CW6 revealed that internal auditors were sent to Mexico several times in 2012 and 2013 to learn what kinds of control processes needed to be implemented in such local operations as payroll, purchasing, etc., but that the auditors did not perform any audits of potential FCPA violations because they were not asked to do so. #37 ¶ 137. CW6 also complained that "a lack of response" from senior executives in Mexico obstructed the auditing team's ability to finish its job and compromised the audit's independence. *Id*. CW2 thought that if Key had focused its internal audits on such critical financial processes, instead of on safety, it would have uncovered improper activity that was overlooked, such as Key's Board of Directors' request in 2012 for an internal audit of the use of company credit cards. *Id*. An audit conducted in 2012 uncovered widespread misuse of these for personal expenses which CW6 substantiated. *Id*. The complaint further asserts that the "confidential witnesses substantiated that Key's operations in Mexico were hampered by accounting irregularities," but does not identify any particular accounting irregularities. #37 at ¶ 167.

In addition, CW2 informed Plaintiffs that CW3, after observing unusual numbers in the accounting records of Key's Mexican operations, informed CW2 that millions of dollars of accruals were listed on these accounting records without being cleared for much longer than the 30-day limits, indeed for over 90 or 180 days, when nothing was booked as an actual sale or payment

CW3 was told not to speak to Lead Plaintiff through his attorney. #37 at ¶ 138.

CW4[24] reported that in January 2014, Defendant Wilson informed him that Key had abruptly and without explanation terminated its Senior Vice President of International, Global Business Development and Technology ("SVP International") and that CW4 would be reporting to another Senior Vice President. #37 a ¶ 139.

When the SEC began its investigation of of Key's possible FCPA violations in Mexico and Russia, the Board of Directors asked CW5 to speak with the SEC and the law firm that Key hired to conduct an internal investigation. Contrary to Key's representations that in pursuing a joint venture by acquiring a drilling company named Geostream in Russia, Key was moving cautiously and following the FCPA and its own policies and procedures, while aligning them with Geostream's, Key suddenly

---

[24] The complaint states at p. 2 that CW4 worked at Key as a Senior Director, Global Marketplace Performance Improvement, from April 2012 to July 2014. Prior to that position, CW4 was Senior Director, West Coast Marketplace Business Development at Key from August 2009 to March 2012. As Senior Director, Global Marketplace Performance Improvement, CW4 worked in a leadership role for the Company's strategic, enterprise-wide business development initiatives. In that role, CW4 reported to: Guillermo Capacho, Senior Vice President of International, Global Business Development and Technology; Kim Clarke, Senior Vice President of Administration; and Jeff Skelly, Senior Vice President of Rig Services and Operations Support.

purchased an initial 50% interest in Geostream in two investments in 2008 and 2009, and then the remaining 50% on April 9, 2013, without performing sufficient due diligences to satisfy the SEC. #37 ¶ 141. CW2 commented, "Due diligence was done, but it wasn't as thorough as it should have been" and did not provide a clear picture of Geostream's operations. #37 ¶ 143. He further noted that there was concern about liability because before Key purchased the remaining 50%, since Key had almost no access to Geostream's books; he characterized the final acquisition as "very messy," with "no visibility on what was going on there" since "[i]nternal audit wasn't even allowed into the [Geostream] building" and "[t]here were no internal audits conducted ever." *Id.* Colleagues in Key's Accounting Group told CW2, "Nobody could tell how the deal was structured or where documents came from." *Id.* The robust internal controls that Defendants touted to investors did not exist.

CW1,[25] a former Vice President of International Human Resources at Key from 2010 to October 2013, revealed that once Key owned 100% of Geostream, Geostream's employees became Key's

---

[25] The complaint at p. 2 states about CW1, first employed by Key in 2008, that his

> responsibilities included created and managing the Company's human resources infrastructure (including policies and procedures, compensation, benefits, recruitment, talent management, and leadership development), both domestically and internationally. This CW reported to Kim Clarke, Senior Vice President of Administration, and Guillermo Capacho, Senior Vice president of International, Global Business Development and Technology.

employees, and Geostream's CEO and other senior executives left Geostream as the result of pressure from Key, which wanted complete control over Geostream's operations. #37 ¶ 142.

After the acquisition was completed, Key allegedly learned that Geostream's structure and finances were far more complicated than Key had expected. Geostream held offshore shell companies, among which it made transfers of ownership from one business to the next. #37 ¶ 144. CW2 asserted that Geostream had "16 companies under the Russian umbrella," and that "[o]bviously the FCPA was really foreign to them. . . . They have a different kind of mentality there." *Id.* Given Russia's reputation for corruption, the complaint asserts that Key was reckless at best and that the lack of oversight obscured whether Geostream's employees were violating the FCPA. *Id.*

Key had already acquired 100% of Geostream, which it characterized as its primary growth strategy in Russia. On February 15, 2013, Alario stated in a conference call with investors and analysts, "Russia is the second-largest oil well inventory market in the world. So there's great reason for Key to be in that market. And we're being very, very patient, as we learn about it and as we get better at convincing a small, select group of customers that this highly reliable equipment that we have over there is a better way to go." #37 ¶ 146. In an October 31, 2013 conference call, Alario stated, "We believe that we can more effectively grow in . . . Russia operating the business [] ourselves." #37 ¶ 145.

On May 16, 2014, when Key filed its Form 10-Q for the quarterly period ending March 31, 2014, revealing that the SEC was investigating Key's operations in Russia, the market first learned of possible FCPA violations by Key.  #37 ¶ 145-46.  Nor was the Russian revelation of Key's corrupt culture unique according to the complaint.  Key gradually began to reveal problems in its Mexican operations when on January 6, 2014 it disclosed in a press release that PEMEX was auditing $372 million worth of Key's billings, resulting in Key's having to take a charge of $2-3 million in 4Q 2013.  #137 ¶ 147.[26]  On February 13, 2014, Key issued another press release, revealing that in connection with these PEMEX audits Key had taken an even larger $3.2 million pre-tax charge.  *Id.*  Yet Key continued to be positive about its future in Mexico.  In a conference call about earnings on February 12, 2014, Alario acknowledged problems caused by PEMEX's budget disputes, but indicated that Key would obtain "mega tenders" and

---

[26] Defendants object that just because the January 2014 audit resulted in Key's taking a $3.2 million pre-tax charge does not mean that something Defendants said in 2012 was false at that time.  #49 at p. 23.  Moreover, the audit involved Key's "aggregate billings of $372 million under its contracts awarded by PEMEX to Key's Mexican subsidiary in 2008 and 2009" (Ex. 14, Jan. 6, 2014 Press Release at 1), which included aggregate billings back to 2008, outside of the Class Period, so there is no reason to infer that the charge even related to billings during the class period.  *Id.*, n.17.  Such "fraud-by-hindsight" is insufficient to show that defendants knew beforehand what they did not disclose until later.  *Lormand*, 565 F.3d at 254; *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005)("Fraud by hindsight is not an actionable claim under the securities laws.").  There is no basis to infer that the pre-tax charge, which constituted less that 1% of the $372 million of billings audited, resulted from overbillings or that Alario and Wilson knew of such overbillings at the time they made their statements.  Thus Plaintiff fails to plead an actionable misrepresentation based on the PEMEX audit, insist Defendants.

"incentivized contracts" from PEMEX in the future and enjoy
continued success in the south of Mexico.  #137 ¶ 148.

        On June 4, 2014, Key filed another 8-K, which disclosed,
"In April 2014, the Company became aware of an allegation
involving Key's Mexico operations that, if true, could potentially
constitute a violation of certain Company policies, including our
Code of Business Conduct, the U.S. Foreign Corrupt Practices Act
(FCPA) and other applicable laws."  #37 at ¶ 149.  It further
stated that it had "conducted an initial investigation of this
matter and the Board of Directors of the Company has formed a
special committee of independent directors to oversee the
investigation" of these and "any other resulting matters." *Id.*
It also indicated that on May 30, 2013 Key had voluntarily made
known the allegation and information from its initial
investigation to the SEC and the DOJ and that fines, criminal
penalties and/or sanctions relating to the alleged FCPA violations
could be imposed on Key.  *Id.*

        Even though Key had not disclosed to the public any of
the reports on the FCPA investigation, the news of possible
violations impacted its financial status.  #37 ¶ 150.  On July 17,
2014 in a press release, Key divulged that (1) it expected "to
record a $30-35 million pre-tax charge for goodwill[27] and other

_____

        [27] In their motion to dismiss (#49 at p.8 n.2, citations
omitted), Defendants explain,

        When the purchase price of a company or an
        asset . . . exceeds the book value of its
        assets, the difference is recorded as
        goodwill, an intangible asset that is not
        amortized or depreciated. . . . ([In other

assets impairments related to its operations in Russia"; (2) it had incurred pre-tax expenses in the amount of $5 million related to the FCPA investigations; and (3) after accounting for the $30-35 million charge, Key expected to report a loss for the quarter in the range of $0.35 to $0.38 per share. *Id.* Key filed its Form 10-Q for the quarterly period ending September 20, 2014 and revealed that in addition to Mexico and Russia, the special committee's investigations now "include[d] a review of certain aspects of the Company's operations in Colombia."  #37 at ¶ 151. The complaint asserts that Defendants' failure to use the FCPA controls and compliance measures it claimed to have in place, would have prevented these violations or allowed Key an affirmative defense; instead its failure to maintain these practices "severely degraded the value of Key's common stock." #37 ¶ 152.

---

words, goodwill is] the "excess of the purchase price over its book value," which is an "intangible asset for accounting purposes"). . . . "Goodwill must 'be tested for impairment at least annually using a two-step process that begins with an estimation of the fair value of a reporting unit. The first step is a screen for potential impairment, and the second step measures the amount of impairment, if any." . . . . Key tested its Russian reporting unit every year from 2010 to 2013 and consistently found that the fair value of the unit exceeded the carrying value. . . . June 2014 is the first time that Key found that impairment had occurred and calculated a corresponding charge.  Notably, Plaintiff does not allege that Key was required to take an impairment charge any sooner than it did.

In sum, Defendants' representations throughout the Class Period that Key strictly complied with the highest ethical standards and complied with all applicable laws and regulations, including the FCPA, were materially incomplete and/or false in light of their failure to disclose *inter alia* "(a) the full magnitude and consequences of the Company's FCPA violations; (b) that the Company's compliance function and internal controls were woefully inadequate or not strictly adhered to; and (c) that violations of Key's internal controls and corporate policy were ignored." #37 at ¶ 154.  Key's Compliance Manual and its Code of Business Conduct contained false and misleading statements from the beginning of the class period.

The Consolidated Amended Complaint then details a number of other material and purportedly misleading disclosures made during the Class Period.  For example, on September 4, 2012 at the Barclays Capital CEO Power Energy Conference in New York, Alario represented that "the core of our story is our business with PEMEX. . . . I don't think there's a better example of value delivered by a service company to a customer than Key's value to PEMEX." #37 ¶ 160.  He also emphasized that PEMEX entrusted Key to perform some of PEMEX's riskiest work and "I think [that] proves that PEMEX has got confidence in Key," while he was leading investors to believe that this confidence would provide future opportunities to do business with PEMEX.  *Id.*  The complaint asserts that the statements in ¶¶ 159–161 were materially false and misleading because "Defendants failed to disclose that

revenues from PEMEX were overstated due to overbilling and that the Company's production was in decline." #37 at ¶ 162.[28]

Regarding Key's operations in Russia and its at-that-time 50% interest in Geostream, Alario represented that its investment in Russia was small but "potentially a good solid market," explaining,

> We're trying to prove a new business plan there on the back of the idea that reliable equipment is more valuable to our customers than some of the equipment that they have over there in country [*sic*]. It's taking longer than we hoped. But I can tell you that over the course of the last couple of quarters, we've convinced more customers than we had in the past that's the right business model and, as a result, our fortunes in Russia have improved.

#37 at ¶ 161. The complaint asserts that these statements about Russia and Mexico are materially false and misleading because Alario did not disclose that Key's growth strategy in both countries was substantially due to or directly attributable to conduct that violated the FCPA. *See also* allegations of Alario at the December 4, 2012 Dahlman Rose & Co. Ultimate Oil Services and E&P Conference in New York City, *id*, at ¶¶ 170, 172, reporting a

---

[28] The complaint asserts similar allegations by Defendant Wilson during a November 1, 2012 earnings call. #37 ¶ 168.
Defendants object that such statements by them are "generalized, optimistic statements and expressions of opinion that courts consistently have held to be inactionable puffery." #49 at p. 23, *citing Southland*, 365 F.3d at 372. Even if they were statements of facts, there are no facts alleged that support the claim that the statements were false when made, that Key actually overbilled PEMEX in 2012, no less that Key's top officials, or anyone else at Key, knew about the alleged overbilling at the time. Nor does the complaint allege facts showing that Defendants knew of any concealed decline in Key's production from PEMEX that year.

1% increase is share price for Key common stock to close at $6.82 on December 4, 2012, ¶ 171; allegations of a press release announcing financial results for 4Q and FY 2012, ¶ 173, reporting a share price increase of over 6% from $8.82 on February 14, 2013 to a closing price of $9.38 on February 15, 2013, ¶ 175; February 15, 2012  conference call with analysts and investors, ¶ 174; Alario's statements at the March 5, 2013 Raymond James Institutional Investors Conference, #37 ¶¶ 182-183; Alario's statements at the June 26, 2012 Global Hunter Securities GHS 100 Conference, #37 ¶¶ 191-192; the July 26, 2013 conference call in connection with its earnings report for 2Q 2013, #37 ¶¶ 193-194 and 197-98, resulting in Key's share price increasing approximately 2% from a closing price of $6.69 on July 25, 2013 to a closing price of $6.82 on July 26, 2013, ¶ 195; statements by Alario and Wilson during an October 31, 2013 conference call in connection with Key's quarterly earnings report, #37 ¶¶ 199-202, causing an almost 4% increase in Key's share price from a closing price of $7.53 on October 30, 2012  to a closing price of $7.82 on October 31, 2013; the third quarter 2013 Form 10-Q filed with the SEC on November 1, 2013, #37 ¶ 203.

On October 2, 2012 at the Johnson Rice Energy Conference in New Orleans, Louisiana, Whichard bragged that Key's "business has doubled in Mexico year-over-year," "we're adding other assets into that market, such as coil, wireline, premium rental equipment, and PEMEX is calling on us to add more and more equipment to their market."  He claimed that he expected Key's success to continue, that Key was seeking business opportunities

not only with PEMEX but with other multinational companies, "so we're broadening our customer base" in Mexico and looking at opportunities in regions in Mexico beyond Chicontepec area, known as the ATG field.   The complaint maintains that Whichard's statements were materially false and misleading because he did not disclose that Key's rapid growth and future prospects in Mexico were largely due or directly related to its violations of the FCPA, that Key's internal controls were knowingly or recklessly inadequate, as discussed previously.

Alario and Whichard allegedly filed a 3Q 2012 Form with certifications that were false and misleading under the Sarbanes-Oxley Act of 2002 ("SOX Certifications," which the complaint quotes in full without specifying which statements Lead Plaintiff considers false or misleading and why)[29] because Alario and

_____

[29]  Section 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7241(a), requires the CEOs and CFOs of publicly traded companies to certify quarterly and annually as to the accuracy of their SEC filings and effectiveness of their internal control over financial reporting.  *Shaw Group*, 537 F.3d at   It does not create a private right of action, "'but establishes that the SEC may sue the CEO and CFO of a company when the company has been required to restate its earnings due to noncompliance with securities laws.'"  *SEC v. Baker*, No. A-12-CA-285-SS, 2012 WL 5499497, at *2 (W.D. Tex. Nov. 13, 2012), *quoting Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 793 (D.C. Cir. 2008).  It also "'requires CEOs and CFOs to reimburse their company for any bonus or similar compensation, or any profits realized from the sale of company stock, for the 12-month period following a false financial report if the company is required to prepare an accounting restatement due to material noncompliance of the [company] as a result of misconduct.'").  *Id., citing Cohen v. Viray*, 622 F.3d 188, 193 (2d Cir. 2010).

        The Court notes that in *Shaw Group*, approving and relying on *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006), the Fifth Circuit concluded that "a Sarbanes-Oxley certification, standing alone, is not indicative of scienter." 537 F.3d at 545.  It agreed with the Eleventh Circuit that there must be "'facts establishing that the officer who signed the

Whichard were aware and/or recklessly disregarded the weaknesses of Key's internal controls that were not disclosed to investors and which "were so woefully inadequate that it made Defendants' public representations regarding them false and misleading."  #37 at ¶¶ 165-167 at pp. 60-62.

In the Form 10K report filed on February 25, 2012, #37 ¶¶ 177-181, Key purportedly made numerous false and misleading statements.  Key reported, "Revenues for our international segment increase $134.2 million, or 67.4%, to $333.3 million in the year ended December 31, 2012," an increase "primarily attributable to

certification had a 'reason to know or should have suspected, due to the present of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.'"  *Id., citing id.*

> To hold otherwise would mean that "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements set forth in the PSLRA. . . . Instead, the court held that "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements."  There must be, in other words, facts establishing that the officer who signed the certification had "a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."

*Id.* at 545 (citations to *Garfield* omitted).  Lead Plaintiff has not provided facts showing "glaring accounting irregularities or other 'red flags'" that would imply that the certifier(s) had "reason to know or should have suspected" that "the financial statements contained material misstatements or omissions," also never identified, regarding any of the certifications referenced in the complaint.

increased activity in Mexico." #37 ¶ 178.  In its yearly goodwill impairment analysis in the 10-K, Key reported that the goodwill for its Russian unit at the end of 2012 was approximately $24.6 million and the fair value of these assets exceeded the carrying value by 17.8%, while Key did not record any asset impairments in that year.  *Id.* ¶ 179.  These statements were false, according to the complaint, because Key's violations of the FCPA significantly impacted its revenue growth in these markets, while the statements falsely implied that Key's success was based on legitimate business activities.  These statements also falsely implied that Key had adequate internal controls, compliance policies and procedures, in place.  *Id.* ¶ 180-181.  The Form 10-K had Sarbanes-Oxley certifications signed by Alario and Whichard stating that the information was accurate and all material changes to Key's internal controls over financial reporting were disclosed.  *Id.* ¶ 181.

In a press release on April 25, 2013, filed the next day with the SEC on Form 8-K, Key announced its financial results for IQ 2013 and revealed that PEMEX had significantly reduced activities in Mexico, resulting in an adverse impact on Key's share price, which dropped nearly 17% from a closing price of $7.09 on April 25, 2013 to a closing price of $5.90 on April 26, 2013.  #37 ¶¶ 184-186.  In the same release Key stated that it intended to expand operations in Russia, again not revealing that its growth strategy was largely based on conduct that violated the FCPA and the erroneous impression it had created that it had adequate internal controls in place.  *Id.* ¶ 187.

Also, on May 3, 2013 Key filed its 1Q 2013 on Form 10-Q, stating that its revenue from its international business had declined because of PEMEX's slowdown, but that its overall revenue for that period increased by $20.6 million, or 33.3%, compared to $82.4 million in 1Q 2012, "primarily attributable to increased activity in Mexico" and also the purchase of the remaining 50% interest in Geostream.  #7 ¶ 188.  These statements were also false and misleading because Defendants did not reveal the impact of Key's conduct violating the FCPA that increased its revenue in these markets and because it did not have adequate internal controls in place, but implied the increase was due to legitimate business activities.  *Id.* ¶ 189.

In 2014 there were growing losses in the price of Key's common stock as negative news about Key's international business operations gradually overwhelmed the positive. In a January 6, 2014 press release, filed the next day on Form 8-K, Key disclosed that PEMEX was auditing $372 million of Key's billings under its contracts with PEMEX and that Key would take a charge of between $2-3 million in 4Q 2013.  #37 ¶¶ 204, 206.  Even though Defendants did not disclose its violations of the FCPA or its lack of effective internal controls, Key's share price dropped over 3% from its closing price of $7.83 on January 6, 014 to $7.55 the next day.

On February 13, 2014 Key issued a press release announcing its 4Q and full year 2013 financial results, which included quarterly International segment revenues of $38.1 million, down 14.5% sequentially.  #37 at ¶ 207.  Despite the

loss, in a conference call the next day Alario remained upbeat about Key's future success in Mexico and Russia.  #37 ¶¶ 208, 210. Key's share price increased more than 2%, rising from a closing price of $7.81 on February 13, 2014 to $8.00 on February 14, 2014. *Id.* ¶ 209.

Key's 2013 Form 10-K, filed on February 25, 2014, warned that Key's "failure to comply with the [FCPA] and similar laws may have a negative impact on our ongoing operations," and "We could be subject to sanctions and civil and criminal prosecution as well as fines and penalties in the event of a find of violation of the FCPA or similar laws by us or any of our employees," but also reported the value of its goodwill in its Russian reporting unit was around $23 million, with the fair value of these assets exceeding the carrying value by 86%, statements that the complaint asserts were false and misleading for the reasons discussed previously.  #37 ¶¶ 212-213.  The document included Sarbanes-Oxley certifications signed by Alario and Dodson.  *Id.* ¶ 214.

On April 30, 2014 Key issued a press release, filed with the SEC the next day on Form 8-K, announcing that in the first quarter of year 2014 its International revenues were down 15.7% sequentially, to $32.1 million.  #37 ¶ 215.  In a conference call on May 1, 2014, Alario stated about Key's business in Mexico, "We've reached the point where we're willing to say that our International business has essentially reached bottom.  Mexico has clearly been a drag on this segment."  #37 ¶ 216.  Yet he also expressed confidence that Key would turn the situation around: "In Mexico we've also recently seen a number of opportunities from

integrated service companies under these incentive contracts, and some of those are under negotiation now.  And hopefully, those will, as you indicate, will [*sic*] get started sooner rather than later." *Id.*  Alario did not discuss the violations of the FCPA nor Key's lack of adequate internal controls, but nevertheless, the share price of Key's common stock dropped from a closing price of $10.04 on April 30, 2014 to a closing price of $9.14 on May 1, 2014.  *Id.* ¶¶ 217-218.

Finally on May 6, 2014 in its Quarterly Report of 1Q 2014 on Form 10-Q, with certifications signed by Alario and Dodson stating that the information was accurate, Key disclosed for the first time that it was being investigated by the SEC for possible FCPA violations in its Russian operations.  #37 ¶ 219.  Between May 7 and May 9, 2014 Key's common stock share price dropped $.64, i.e., more than 7%.  *Id.* ¶ 220.  On June 4, 2014 Key filed an 8-K disclosing that it had become aware of additional potential FCPA violations.  *Id.* ¶ 222.  On July 17, 2014, as indicated earlier, Key announced in a press release providing updated guidance for 2Q 2014 that it expected a $30-35 million pre-tax charge for goodwill and other assets impairments related to its operations in Russia, that it had incurred approximately $5 million in pre-tax expenses relating to the FCPA investigations, and that it expected to report an additional loss for the quarter of between $0.35 to $0.38 per share.  #37 ¶ 223.  The price of a share of Key common stock dropped 16% to $1.34 per share to close at $7.03 on July 18, 2014.  *Id.*

On July 21, 2014, investment bank Imperial Capital
downgraded Key to In-Line from Outperform and lowered its price
target for shares to $7.50 from $10.50.  Two days later brokerage
firm Wunderlich Securities repeated a "Hold" rating on Key and
stated, "Overall it's clear that Key is struggling even as the
domestic services market is showing overall improvement and while
it has been able to reduce debt nicely, we remain Hold rated given
the company-specific headwinds facing KEG."  #37 ¶ 225.

To demonstrate scienter, the complaint, asserting that
at the end of the Class Period Key's revelations first of FCPA
violations in its Mexican operations, then less than a month later
of possible violations involving its Russian operations, and  on
November 3, 2014 of investigations of its Colombia operations,[30]
contends that violations of the FCPA could not have occurred "in
so many different markets without the knowledge, complicity and/or
acquiescence of personnel at the highest level of the Company."
#37 at ¶ 227.  Collectively, "Lead Plaintiff's allegations support
a strong inference of fraudulent intent on the part of Defendants"
or, at minimum, "the strong inference that Defendants' conduct was
highly unreasonable and an extreme departure from standards of
ordinary care."  *Id*.  If Key's much touted internal controls were
working properly, its senior management would have been aware of
these FCPA violations before they materialized.  If Defendants
were not aware of the violations beforehand, the SEC

---

[30] Defendants point out that ¶ 151 of the complaint's
allegations that Key's internal investigations "include[d] a
review of certain aspects of the Company's operations in Colombia"
occurred after the Class Period and are not relevant.

investigations would have made them aware of potential violations in Mexico and Colombia after the SEC's increased scrutiny of Key's Russian operations for FCPA violations.  *Id.* at ¶ 228.

The complaint asserts that by virtue of their positions at Key, Individual Defendant had access to undisclosed adverse information about Key, its business, operations, finances, and present and future business prospects.  They had access to such information through internal corporate documents, conversations, connections with other corporate officers, traders, marketing experts, attendance at management and Board of Directors' meetings, etc.  Thus, the complaint claims, "it is appropriate to treat Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases, and public statements . . . was the result of the collective actions of the Individual Officers identified above." #37 ¶ 252.

Moreover, "[a]s officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information . . . and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information" about Key.  #37 ¶ 254.  Moreover their positions

-72-

allowed them to control the substance of the SEC filings, press releases, and other public statements about Key during the Class Period.  #37 ¶ 255.  They were each given copies of the allegedly misleading documents before or shortly after their issuance and had the ability to prevent their issuance or correct them before their release.  *Id.*  They are each liable as a participant in a scheme, plan or course of conduct that operated as a fraud and deceit on Class Period purchasers of Key's securities.  #37 ¶ 256.

Lead Plaintiff alleges that plaintiffs are entitled to a presumption of reliance based on the fraud on the market doctrine.

Because the Court does not yet address the issue of class certification, it does not otherwise summarize allegations relating to it.

### IV.  Motions to Dismiss (#37 and 50)

The Court will address the arguments in the two motions together, noting that Whichard has joined in that of the other Defendants.

Defendants observe that Plaintiffs have identified four broad categories of allegedly false and misleading statements during the Class Period that it claims violated Section 10(b) and Rule 10b-5:  (1) statements in the Company's Code of Business Conduct and FCPA Compliance Manual; (2) statements about Key's business in Mexico and Russia that purportedly omitted disclosing that Key's growth and growth strategy largely resulted because of FCPA violations; (3) statements allegedly falsely portraying Key's business in Mexico; and (4) statements in certifications

-73-

accompanying Key's SEC filings that purportedly omitted internal control deficiencies and FCPA violations at Key.  #49 at p. 10. Furthermore Defendants assert that because the allegations in the controlling complaint were not made based on Plaintiff's personal knowledge, they are based on information and belief, triggering the PSLRA requirements that Plaintiff must plead sufficient facts with particularity to support its claims that the statements were false when made. *ABC Arbitrage*, 291 F.3d at 351.

Defendants first contend that Plaintiffs' Amended Complaint fails to allege falsity with the requisite particularity under the PSLRA.  Defendants never represented that there would never be an FCPA problem, but instead warned investors of the risks of a FCPA violation and that the Company's statutory FCPA compliance depended on its compliance program and the efforts of its employees, agents, affiliates and business partners to follow it.

While Plaintiffs claim that statements in Key's Code of Business Conduct and FCPA Compliance Manual[31] were material

---

[31] As examples Defendants list the following:  (1) the Code establishes "high standards of ethics and legal behavior for all employees and officers"; (2) the FCPA "prohibits payments to foreign officials for the purpose of obtaining or keeping business"; (3) "It is our policy that the Company, as well as each person or entity acting as a representative or advisor to the Company, shall fully comply with all applicable provisions of the FCPA"; and (4) "Improper gifts, payments or offerings of anything of value to foreign officials could jeopardize the growth and reputation of the Company, and will not be tolerated.").  #37, ¶¶ 94–99.  The complaint asserts such statements were false and misleading because Defendants, at the time the statements were made, were aware of and/or recklessly disregarded material weaknesses in Key's internal controls that were not disclosed to the investing public."  #37, ¶¶ 156, 158.  Very similar allegations were rejected in *City of Rockton Retirement System v.*

misrepresentations and omissions, Defendants point out that courts have recognized that statements in such documents are immaterial puffery, not the kind of statements on which reasonable investors rely. *See, e.g., In re Franklin Bank Corp. SEC. Litig.*, 782 F. Supp. 2d 364, 381 (S.D. Tex. 2011)("Allegations that amount to little more than corporate 'cheerleading' are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because analysts are too sophisticated to rely on vague expressions of optimism rather than specific fact."), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 Fed. Appx. 334 (5th Cir. Mar. 14, 2012). Thus "generalized positive statements about a company's progress" will not impose liability, and "statements that are predictive in nature are actionable only if they were false when made." *Id. See, e.g., also Nathenson v. Polycom, Inc.*, No. 13-cv-3476 SC, 2015 WL 1517777, at *6 (N.D. Cal. Apr. 3, 2015)(rejecting claim based on code of conduct because "the standards contained therein are inherently aspirational and hence immaterial" and "[n]o reasonable investor would have construed

---

*Avon Products, Inc.*, No. 11-cv-4665 PGG, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014)("Here, a reasonable investor would not rely on the statements discussed above as a guarantee that Avon would, in fact, maintain a heightened standard of legal and ethical compliance. The aforementioned statements from the Ethics Codes and the Corporate Responsibility Reports offer no assurance that Avon's compliance efforts will be successful, and do not suggest that Avon's compliance systems give the Company a competitive advantage over other companies. . . . Instead, these statements merely set forth standards in generalized terms that Avon hoped its employees would adhere to. Such statements are not material.").

[the statements] as not just an aspirational statement of intention, but a warranty that [the defendant was] compliant"). Furthermore the complaint fails to allege any facts demonstrating that anything in the Code and the Manual was false.

The complaint contains allegations from six purported "confidential witnesses" ("CWs"), but the sum of their allegations is that Key's FCPA controls were adequate, not even close to constituting particularized allegations showing that the Code or Manual or something Individual Defendants said was false at the time. *See, e.g., In re Intelligroup SEC. Litig.*, 527 F, Supp. 2d 262, 359-61 (D.N.J. 2007)(holding that "personal opinions void of specific details regarding the basis [for the CW's] personal knowledge" add nothing to falsity or scienter); *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1208 (D. Or. 2006)("[A] shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough."), *(quoting In re Metawave Communications Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1070 (W.D. Wash. 2003)), *aff'd*, 552 F.3d 981 (9th Cir. Jan. 12,2009), as amended (Feb. 10, 2009). Specifically none of the CWs (1) "alleges that an FCPA violation actually occurred," (2) "alleges that he ever reported his concerns about FCPA controls to Key's FCPA Compliance Officer, as required by Key's [FCPA] Manual" (Ex. 22),[32] and (3) "allegedly ever communicated his

---

[32]    The Manual requires all employees to sign a Certificate of Compliance that contains the following statement: "I AGREE TO PROMPTLY CALL THE FCPA COMPLIANCE OFFICER AND PROVIDE A WRITTEN REPORT TO THE FCPA COMPLIANCE OFFICER FULLY DESCRIBING

concerns, directly or even indirectly, to any of the Individual Defendants--none claims to have told any of the Individual Defendants of any problems with FCPA controls, nor did any author any memos or see any reports decrying the state of FCPA controls directed to Individual Defendants." #49 at pp. 25-26. While the Amended Complaint relies heavily on the allegations of CWs, they are merely opinions that Key's internal controls were inadequate. Case law standardly finds such opinions add nothing to scienter analysis. There are no allegations that three of the four Individual Defendants (Alario, Whichard, and Dodson) had any communications with the CWS.[33] *See Avon*, 2014 WL 4832321 at *32 (holding that confidential witnesses' statements about the efficacy of the company's FCPA compliance program (e.g., "Avon did not even have an independent compliance function prior to 2009"; "by 2010 Avon still had not implemented key aspects of an FCPA compliance program"; "Avon's compliance efforts prior to 2009, if any, would have been conducted by attorneys with no specialized computer experience"; "Avon lacked the type of compliance programs

_____

ANY CIRCUMSTANCES OF WHICH I AM AWARE THAT APPEAR TO BE IN VIOLATION OR A POTENTIAL VIOLATION." Ex. 22 at p. 22.

[33] The only contact or communication of a CW with an Individual Defendant was in January 2014, when CW4 reported receiving a call from Defendant Wilson about the termination of Key's Senior Vice President International, Global Business Development & Technology ("SVP International"), to whom CW4 reported. CW4 purportedly claimed that Wilson said, "you can't ask me any questions as to why, but [SVP International] is no longer with the company and you will be reporting to [another Senior Vice President]." Complaint, #37 ¶ 139. Defendants note that the significance of this fact is unclear from the pleading and Wilson's comment does not demonstrate anything fraudulent on its face or show Wilson had scienter regarding any statement that the complaint alleges was false when he made it.

that would be expected of a company of Avon's size.") were insufficient to demonstrate scienter without allegations that their concerns were raised or otherwise communicated, such that the individual defendants "would have reason to know that the compliance programs in place were inadequate to detect FCPA violations"), *citing In re Gentiva SEC. Litig.*, 932 F. Supp. 352, 378 (E.D.N.Y. 2013)("[T]he Court must assess whether there are allegations that the CWs were privy to the Individual Defendants' knowledge of or access to contemporaneous information that would show that their representations were false."), *citing In re Citigroup SEC. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010)("Fatal to plaintiffs claims . . . is that they do not allege with specificity that any of the confidential witnesses relied upon in the Complaint presented information to the individual defendants."). Furthermore because of the absence of particularized pleading that the statements in Key's Code or Manual were false when made, all claims based on Key's Code or Manual must be dismissed.[34]

---

[34] In a footnote, Defendants provide three more reasons why the statements in the Code and Manual are not actionable under Section 10(b) and Rule 10b-5. First, they are merely confirmatory because they were in place years ago (the Manual came out in June 2008, the Code in April 2009) and the Fifth Circuit long ago held that statements confirmatory of prior statements cannot be the basis of securities fraud claims. *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665-66 (5th Cir. 2004)(explaining that "confirmatory information has already been digested by the market and will not cause a change in stock price. Because the presumption of reliance is based upon *actual movement* of the stock price, confirmatory information cannot be the basis for a fraud-on-the-market claim."). Second, the statements would be barred by the five-year statute of repose for Rule 10b-5 claims. *Hall v. Variable Annuity Life Ins. Co.*, 727 F.3d 372, 375 n.4 (5th Cir. 2013), *citing* 28 U.S.C. § 1658(b)("[A] private right of action

Defendants contend that Plaintiffs fail to allege that all but two of the general statements challenged by Plaintiffs falsely reported any facts about Key's operations in Mexico or Russia or mischaracterized Key's view of its prospects there.[35] Defendants maintain that the assertion that the statements were materially false and misleading because Key did not reveal that the growth in these countries was actually driven by Key's violations of the FCPA fails to state a claim because Plaintiffs failed to allege particularized facts showing that FCPA violations actually occurred or were the cause of Key's growth. An investigation is not a violation. *See In re China Valves Tech. Sec. Litig.*, 11 CIV 0796 LAK, 2012 WL 4039852, at *8 (S.D.N.Y. Sept. 12, 2012)(without facts showing an FCPA violation, "the alleged omission of potential FCPA liability is insufficient in its present form"); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2012)("The announcement of an [SEC] investigation reveals just that--an investigation--and nothing more."); *Avon*, 2014 WL

---

that involves a claim of fraud . . . may be brought not later than the earlier of--(1) 2 years after discovery of the facts constituting the violation; or (2) 5 years after such violation."). *Hall* explains, *id*. at n.5, "'While § 1658(b)'s 2-year deadline is a statute of limitation, its 5-year deadline is a statute of repose that completely 'eliminate[s] the underlying right[] when [it] lapses[s]. *See Margolies v. Deason*, 464 F.3d 547, 551 (5th Cir. 2006).'" Third, the Code and Manual "are classic examples of corporate documents with no attributed author, and, as such, run afoul of the Fifth Circuit's clear prohibition on group pleading." #49, at p. 18 n,8.

[35] Defendants also note that "the vast majority of the challenged statements were precisely the kind of generalized, optimistic, and forward-looking statements and expressions of opinion that courts consistently have held to be inactionable puffery." #49, p. 20 n.13.

4832321, at *23 ("[T]he existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter."). Plaintiffs also fail to plead any facts showing that there were FCPA violations, no less that they were responsible for or an integral part of Key's growth in Mexico and Russia and that they generated any revenue for Key.

Furthermore, Defendants insist that Plaintiffs failed to raise a strong inference of scienter. There are no allegations suggesting that Defendants had any motive to commit securities fraud or that Defendants sold stock during the Class Period or at unusual times and at unusual prices, or that Key used its stock to purchase other companies. Nor do Plaintiffs provide particularized allegations that anything said by any Individual Defendant was known to be false by the Individual speaking at the time he spoke. Finally Plaintiffs assert that because Key and the SEC were investigating possible FCPA violations, such FCPA violations must have occurred and Individual Defendants must have known about them at the time statements issued. Here, too, such scienter-by-inference arguments have been standardly rejected by the courts. Defendants further note that the complaint's allegations contradict each other: it alleges that Key falsely represented that its internal FCPA controls were strong when the opposite was true, but contemporaneously alleges that Individual Defendants must have known of the FCPA violations because a functional FCPA compliance system would have alerted those up the corporate ladder of such FCPA violations. Instead, argue Defendants, the complaint gives rise to a much stronger inference

that to the extent Key had FCPA problems, Individual Defendants were not aware of them.

Last, the complaint fails to allege loss causation, i.e., that the alleged misrepresentations caused inflation of the price of Key's common stock. Defendants insist that the two stock price drops that occurred after Key revealed the "truth" about its business in Russia and Mexico were not the result of corrective disclosures because (1) as a matter of law, FCPA-related investigations are not, by themselves, corrective disclosures (*Pub. Employees' Retirement Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014)("[C]ommencement of government investigations on suspected fraud do not, standing alone, amount to a corrective disclosure."))[36]; and (2) the break between the disclosures and the purported fraudulent misrepresentations precludes a finding that the disclosures were corrective in nature.[37] Simply alleging that Plaintiffs purchased Key's common stock at inflated prices and that the stock price fell after negative news of the Company's finances and operations came out is insufficient to plead loss causation. *Lormand*, 565 F.3d at 256.

---

[36] *In accord, Meyer*, 720 F.3d at 1201 ("[T]he commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b).").

[37] "A plaintiff must prove that the misstatements--not 'other intervening causes such as 'changed circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events'--were the cause of her economic injury, unaided by any presumptions attending efforts to prove transaction causation." *Ludlow v. BP, PLC*, 800 F.3d 674, 682 (5th Cir. 2015), *petition for cert filed,* No. 15-952 (Jan. 25, 2016).

Rather Plaintiffs must make a plausible showing of loss causation that when "the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate and thereby proximately cause the plaintiff's economic loss." *Id.* at 255.[38]  Plaintiffs must allege that the stock price declined in response to a "corrective disclosure," i.e., a statement demonstrating that "truth made its way into the marketplace," i.e., "the truth obscured by the fraudulent statements." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir. 2009).  Instead, here there is a complete disconnect between the alleged fraud and the two disclosures that precipitated the stock price drops, i.e., the $.64 drop between May 7 and May 9 2014 after Key disclosed the investigation for possible FCPA violations in Russia, and (2)the $1.34 drop following Key's July 17, 2014 disclosure that it would take the pre-tax charge off associated with the writedown of goodwill from the Geostream acquisition in Russia.  #37 at ¶¶ 219-20; 222-23.  The disclosures about the FCPA investigations into Key's operations in Russia and Mexico are entirely disconnected from the alleged misrepresentation in the complaint, so the statements are not corrective disclosures and the complaint must be dismissed for failure to plead loss causation.

---

[38] There must be sufficient allegations that there was a causal connection between the defendant's material misrepresentation and the plaintiff's economic loss, e.g., that the market had a negative reaction to the corrective disclosure that revealed the falsity of the defendant's representation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

Backing up the complaint's allegations with documentary evidence, Defendants maintain that Key was open and transparent about its business operations in Mexico, including about the significance of its relationship with PEMEX.  Among its reports to the SEC Key identified its reliance on PEMEX as a "Risk Factor" in its Form 10-K in 2009.[39]  Ex. 2, Feb. 26, 2010 Form 10-K at 15. When PEMEX's budget was reduced, Key's operations in Mexico were also reduced in 2010.  Ex. 3, Feb. 25, 2011 Form 10-K at 26-27, 32.  In contrast Key significantly increased its activity in Mexico and generated "significant revenue for contracts with the Mexican national oil company" in 2011.  *Id.* at 6.  In September 2012 at a conference Alario spoke of PEMEX as the "core" of Key's Mexican business.  In 2012 Key's business in Mexico was not as good as the previous year, as Key reported, Ex. 6, Feb. 14, 2013 Press Release at 2, but Key was optimistic that it would rebound because it did in 2011 from the similar earlier downturn.  Ex. 7, Feb. 15, 2013 Earnings Call, Tr. at 2.  Key observed that it needed to "diversify the type of work we do, who we do it for and where we do it" to free its business in Mexico from the up and down cycles of PEMEX, *Id.* at 4.  Nevertheless in April 2013, Key reported a 13% decrease in revenue due mainly to the "lower-than-anticipated activity in Mexico," as PEMEX reduced its spending in the North region because it had spent its 2013 budget by the end of 2012, including the ATG asset where Key mainly worked, into November 2013.  Ex. 8, Apr. 26, 2012 Earnings Call Tr. at 2-3; Ex.

---

[39] Defendants have attached copies of all SEC Forms they reference to their motion to dismiss.

9, Nov. 1, 2012 Form 10-Q at 34, 36, 38-39.  So Key began transferring its operations to other regions, loosening its dependence on PEMEX's North Region budget.  Key disclosed on January 6, 2014 that it expected to take a charge of between $2 and $3 million in the fourth quarter of 2012 with an audit of its billings under its contracts with PEMEX.  Ex. 14, Jan. 6, 2014 Press Release at 1.  *See* footnote 26 of this Opinion and Order.

The alleged misrepresentations are generic, forward-looking statements concerning Key's overall business in Russia and Mexico or mere puffery about Key's internal controls.  None of the statements is a guarantee that the FCPA investigations or violations would never occur in relation to Key's operations in these area, nor that Key's internal controls were foolproof.  Furthermore statements about the materialization of risks that the Company has previously disclosed and warned against are not corrective disclosures.

Key contends that Russia was never a central focus of its international growth strategy, but "a small market for Key" according to Alario.  Ex. 7, Feb. 15, 2013 Earnings Call Tr. at 9. Basically Key's operations were comprised of an ownership in Geostream, in which it gradually obtained first a 26% interest, then 50% in March 2009, and finally 100% on May 3, 2013.  Key reported satisfactory progress in the region until political instability began threatening its operations in 2014.  In July of that year Key revealed that it expected "to record a $30 million to $35 million pre-tax charge for goodwill and other asset impairments related to its operations in Russia."  Ex. 18, July

17, 2014 Press Release at 1.  Key notes that it tested its Russian reporting annually from 2010 to 2013 and found that the fair value of the unit exceeded its carrying value until June 2014, when Key found that an impairment had occurred and calculated the relevant charge.  Ex. 3, Feb. 25, 2011 Form 10-K at 45, 80; Ex. 4, Feb. 29, 2012 Form 10-K at 46; Ex. 5, Feb. 25, 2013 Form 10-K at 41; Ex. 1, Feb. 25, 2014 Form 10-K at 41; #49 at 8 n. 2.  Key emphasizes that Plaintiff does not allege that Key was required to take an impairment charge earlier than it did.

Key argues that throughout the Class Period it repeatedly disclosed FCPA compliance problems as a primary risk factor in conducting international operations that could negatively impact its business. *See, e.g.,* Ex. 5, Feb. 25, 2013 Form 10-K at 16; Ex. 1, Feb. 25, 2014 Form 10-K at 17.  It adopted its Code of Business Conduct and its FCPA Compliance Manual to instruct employees about their obligations under the FCPA and established procedures to be followed, but it never guaranteed that these efforts would prevent any or all violations.  When investigations into possible FCPA violations were initiated 2014, first in Russia and then in Mexico, Key disclosed them in SEC filings, it stated that it hired independent outside counsel to address these investigations, and it self-reported to the SEC and DOJ.  In a July 17, 2014 it also disclosed that it incurred approximately $5 million in costs relating to the investigations. Ex. 18, July 17, 2014 Press Release at 1.

As for the Sarbanes-Oxley Act certifications signed by Alario and Whichard, attached to Key's SEC filings during the

Class Period, which the complaint at ¶¶ 166-167 asserts were materially false and misleading because Alario and Whichard "were at the time aware of and/or recklessly disregarded material weaknesses in Key's internal controls that were not disclosed to the investment public," Defendants maintain that the allegation confuses financial reporting controls in the Sarbanes-Oxley certifications with the anti-corruption policies or controls designed to ensure FCPA compliance. *See In re Invision Techs. Inc. Sec. Litig.*, No. C-04-3181 MJJ, 2006 WL 538752, at *6 & n.2 (N.D. Cal. Jan 24, 2006)(rejecting allegation that purported lack of FCPA-related controls rendered [Sarbanes-Oxley] certifications false and misleading). Nor are there any particular facts alleged to show that Alario and Whichard knew that what they were certifying was not true. *City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 420 (D.C. Del. 2009)("The Act . . . does not mandate officers certify that their company's reports are completely devoid of any misleading statements or omissions. Of course, this is not a license for executives to simply bury their head in the sand, but it does mean that they can only certify the truthfulness of their reports based on the information they know, or of which they should reasonably have been aware, at the time."); *Shaw Group, Inc.*, 537 F.3d at 545 ("There must be, in other words, facts establishing that the officer who signed the certification had a 'reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."). Plaintiffs have

failed to allege facts demonstrating that at the time Alario and
Whichard signed the certifications, Alario and Whichard knew of or
recklessly disregarded any weaknesses in Key's internal controls,
so Plaintiffs' certification claim must fail.  Nor do Plaintiffs
plead particularized facts giving rise to a strong inference of
scienter, that they knew what they were certifying was untrue.
*City of Roseville,* 686 F. Supp. 2d at 420 ("[Sarbanes-Oxley] does
not mandate officers certify that their company's reports are
completely devoid of any misleading statements or omissions.
Officers are not guarantors of their truth.  Instead, they must
certify that they personally have no *knowledge* of such misleading
statements and omissions.  Of course this is not a license for
executives to simply bury their heads in the sand, but it does
mean they can only certify the truthfulness of their reports based
on the information they know, or of which they should reasonably
have been aware, at the time.").[40]

        Indeed, Defendants highlight the fact that Plaintiffs
fail   to   allege   any   motive   for   Defendants'   alleged
misrepresentations, neither insider trading nor personal gain.
There is no allegation that any Defendant sold stock and/or
profited from the alleged fraud during the Class Period, thus
undermining any inference of scienter.  *Nathenson*, 267 F.3d at

---

        [40] See, e.g., *In re Franklin Bank Corp. Sec. Litig.*, 782
F. Supp. 2d 364, 378 (S.D. Tex. 2011)("To infer scienter from
[Sarbanes-Oxley] certifications, there must be facts establishing
that the officer who signed the certification had a "reason to
know, or should have suspected, due to the presence of glaring
accounting irregularities or other 'red flags,' that the financial
statements contained material misstatements or omissions."),
*citing Shaw Groups*, 537 F.3d at 545.

410, 421 ("'The fact that other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'"), *quoting Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). "Where . . . the plaintiff has not alleged a clear motive for the alleged misstatements or omissions, the strength of its circumstantial evidence of scienter must be correspondingly greater." *R2 Investments LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005); *in accord Tuchman v. DSC Comm'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). That circumstantial evidence must be very specific, e.g., that a specific individual knew a specific statement was false at the time it was made, or naming specific documents, including author, recipient, date, and contents; allegations of unnamed documents or regular reports that Individual Defendants received by virtue of their positions will not suffice. *Abrams*, 292 F.3d at 432 ("The plaintiffs' allegations regarding non-specific internal reports are also inadequate. An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors, and recipients."). Similarly allegations of weaknesses in internal controls or even actual accounting violations are insufficient without facts showing that the defendants knew about them. The complaint fails here: there are

no allegations that any Individual Defendant acted with scienter in making any particular statement.

Finally, contend Defendants, because Plaintiffs have failed to state a primary violation of § 10(b) and Rule 10b-5, their derivative control person claims under section 20(a) must also be dismissed. *Shaw*, 537 F.3d at 545.

Whichard's separate motion to dismiss (#50) alleges additional grounds for dismissal of claims solely against him. The only allegations about him are the following: (1) Whichard served as Key's CFO from March 2009 until he retired in March 2013; (2) Whichard allegedly made false statements when he discussed Key's international growth at the Johnson Rice energy Conference in Orlando Florida on October 2, 2012, full transcript attached as Ex. A[41]; and (3) Whichard signed certifications required by the Sarbanes-Oxley Act on November 7, 2012 for Key's third quarter 2012 filing, and on February 25, 2013 for Key's 2012 annual report. The complaint also alleges that Whichard made misleading statements in Key's 2012 Form 10-K. The complaint does not assert any particularized facts, does not assert any facts showing that Whichard knew of any violations of the FCPA, participated in any FCPA violations or benefitted from any alleged FCPA violations. It does not allege facts showing the he knew or was reckless in not knowing of any misstatements in any of Key's

---

[41] The complaint also states that he attended two other conferences (the Pritchard Capital Energize Conference in San Francisco, California on January 4, 2012 and the Raymond James Institutional Investors Conference in Orlando, Florida on March 6, 2012), but does not allege that he made any misstatements at them.

financial reporting nor that Key had to restate any financial information while Whichard was CFO.  Nor does the complaint allege that any of the CWs communicated with Whichard about issues in this action.   Finally the complaint does not provide particularized facts that create a cogent and compelling inference that Whichard committed securities fraud.  Thus the claims against him should be dismissed.

The complaint alleges that at the Johnson Rice Energy Conference he made two false or misleading statements relating to Mexico, but it misquotes them (#37 ¶ 163).  Whichard states them in full, as evidenced by th transcript, Ex. A:

> Our business has doubled in Mexico year-over-year.  And in addition to doubling of our service rig business, we're adding other assets into that market, such as coil, wireline, premium rental equipments, and PEMEX is calling on us to add more and more equipment into their market.  (Ex. A at 3)
>
> ****************
>
> And just focusing on international briefly, I mentioned the growth that we're seeing in Mexico.  We expect it to continue.  Our business opportunities are with PEMEX obviously, but also with other large multinational companies, so we're building our customer base, as it were, in Mexico.  We're looking at opportunities in other regions of Mexico outside of the Chicontepec areas, referred by them as the ATG field.  (Ex. A at 4)

Whichard points out that the complaint does not claim that any of these statements is false, but only that Whichard failed to reveal that "Key's 'rapid growth' and 'future prospects' in Mexico were largely attributable to or directly related to conduct that violated the FCPA."  #37 ¶ 164.  Whichard emphasizes that the

complaint does not provide any particularized facts showing that
(1) there was any conduct in Mexico that violated the FCPA; (2) if
there were, that Whichard was aware of it at the time he made
these statements; and (3) that the purported FCPA violation would
have rendered any of these statements misleading.

As for the certifications, which are identical in all
material respects, the complaint asserts that "Alario and Whichard
were at the time aware of and/or recklessly disregarded material
weaknesses in Key's internal controls that were not disclosed to
the investing public."  #37 ¶ 167.  The complaint does not
identify which of the provisions in those certifications were
allegedly false or misleading nor provide particularized facts to
support the claim.  Nor does it provide particularized facts to
show that when he signed the certifications, Whichard was aware of
any "material weaknesses" in Key's internal controls.  "Material
weakness" in a company's internal controls is a term of art in
accounting that means "a deficiency, or a combination of
deficiencies, in internal control over financial reporting, such
that there is a reasonable possibility that a material
misstatement of the registrant's annual or interim financial
statements will not be prevented or detected on a timely basis."
17 C.F.R. § 240.12b-2.  There are no facts alleged showing that
Whichard had actual knowledge of any material weakness in Key's
internal controls over financial reporting, nor allegations that
any CW told him of any material weaknesses in internal controls.
The Sarbanes-Oxley certifications refer to "internal control over
financial reporting"; they do not relate to FCPA compliance

policies and procedure and do not make any statements about the
adequacy of systems designed to insure compliance with the FCPA.
Even if they did, the complaint states that Key had policies,
procedures, and training (including the Code, the Manual, and
anti-corruption training) to address FCPA issues and that when Key
became aware of a potential problem in Mexico, it launched an
investigation and informed the SEC and DOJ.  #37 at ¶¶ 94, 99,
105, 149.  While Plaintiffs allege that CW6 stated, "I don't think
internal audit [at Key] ever audited internationally" (¶ 135),
there is no allegation that international audits are a requirement
or that they are required for a company to have adequate internal
controls over financial reporting.   Key does file audited
consolidated financial statements, and its auditors not only found
that Key did not have a material weakness in internal controls for
the year ending December 31, 2012, but its independent auditors
confirmed that for that year "the Company maintained, in all
material respects, effective internal control over financial
reporting." Key's Form 10-K, Ex. B at 46.  The complaint does not
point to any misstatement in Key's financial reporting that would
have been discovered had an internal audit of international
operations been done.

The complaint also alleges that "Key's operations in
Mexico were hampered by accounting irregularities" (#37 ¶ 167).
While the complaint alleges, "CW2 was contacted by CW3 to discuss
unusual numbers that CW3 observed in the accounting records of
Key's Mexican operations" related to accruals on Mexican books
(*id.* ¶ 138), it fails to identify when these alleged observations

occurred or to what they related within the Mexican operations or that the accruals resulted in any misstatement in Key's financial reporting.  Moreover the complaint itself reflects that the CW2 did not use the words "accounting irregularities," but instead "was contacted by CW3 to discuss 'unusual numbers,'" and does not define "unusual numbers." #37 ¶ 138.  The complaint does not allege that the accruals were the result of a lack of internal control over financial reporting nor does it assert that Whichard had any knowledge about the accruals.

The complaint alleges that Key's acquisition of the last half of Geostream was done without due diligence, a claim unsupported by particularized facts, but is Plaintiffs' basis for claiming that Whichard's certification was false and misleading about internal controls over financial reporting.  The complaint, however states that the acquisition took place on April 9, 2013 (¶ 55), not only after Whichard had left Key the previous month, but months after the only two certifications the complaint asserts that he signed.  Thus as a claim against him, it fails.

On February 25, 2013 Key filed its Annual Report on Form 10-K with the SEC, which included the following in the "Risk Factors" section, ¶ 177:

> Our ability to comply with the FCPA and similar laws is dependent on the success of our ongoing compliance program, including our ability to continue to manage our agents, affiliates and business partners, and supervise, train and retain competent employees.  Our compliance program is also dependent on the efforts of our employees to comply with applicable law and our Business Code of Conduct.  We could be subject to sanctions and civil and criminal prosecution

as well as fines and penalties in the event
of a finding of violation of the FCPA or
similar laws by us or any of our employees.

*See City of Brockton*, 2014 WL 4832321 at *16 ("[S]tatments from
the Ethics Codes and the Corporate Responsibility Reports offer no
assurance that Avon's compliance efforts will be successful . . .
. Instead, these statements merely set forth standards in
generalized terms that Avon hoped its employees would adhere to.
Such statements are not material.").

The complaint also charges that the 2012 Form 10-K,
certified by Whichard, was false or misleading regarding
statements (1) that Key's revenue growth in its international
segments as "primarily due to increased activity in Mexico"
because, again, "Defendants failed to address the significance of
the conduct that violated the FCPA" in that growth, but implied
its success was based on entirely on legitimate business
activities; (2) that Key did not need to record any asset
impairments (¶ 179-180); and (3) that Key had adequate internal
controls in place, including some to prevent FCPA violations. The
complaint does not allege any particularized facts demonstrating
that Key's Russian or Mexican assets should have been impaired
because of FCPA violations (which, again, are not identified) or
that Whichard purportedly knew at the time he signed the 2012 Form
10-K that Key's Russian or Mexican assets should have been
impaired (also unsupported by facts). Nor does it allege that the
impairment should have been taken before it actually was in June
2014.

-94-

Whichard insists that the complaint fails to state a claim under § 10(b) and Rule 10b-5 for securities fraud or for control person liability under § 20(a) against him.

Regarding the former, Whichard contends that Plaintiffs fail to meet pleading requirements for scienter.  Lead Plaintiff asserts that its allegations are "grounded in eyewitness accounts of misconduct," but fails to specify that alleged misconduct (who did what, where, when or why) and fails to allege that any eyewitness witnessed any misconduct by, or discussed suspected violations with, Whichard.  Nor have Plaintiffs identified any specific communications with or reports to Whichard that directly contradict his statements.  *Abrams*, 292 F.3d at 432; *Rosenzweig*, 332 F.3d at 868 (dismissing complaint where report "fail[ed] to identify exactly who supplied the information [that contradicted company's public disclosures] or when [management] knew the information").

Moreover the complaint asserts that "Individual Defendants," "personnel at the highest level," and unnamed "senior management" must have known of the alleged violations based on their positions.  #37 ¶¶ 227, 238, 242.  Not only may Plaintiffs not use group pleading allegations to create an inference of scienter as to individual defendants, but conclusory allegations that they must have known of the alleged fraud due to their positions and/or ability to access information are insufficient to state a claim.  *Southland*, 365 F.3d at 365 ("The 'group pleading doctrine conflicts with the scienter requirement of the PSLRA"; "corporate officers may not be held responsible for unattributed

corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporations's affairs is pleaded"); *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir.)("We have rejected the group pleading approach to scienter and instead look to the state of mind of the individual corporate official or officials 'who make up or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of the corporation's officer and employees acquired in the course of their employment."), *cert. denied*, 558 U.S. 873 (2009); *Abrams*, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company"); *Shaw Group*, 537 F.3d at 535 (same). Lead Plaintiff's assertion that all Defendants must have been aware of unidentified FCPA violations because Mexico and Russia are "notoriously corrupt" and because the SEC and the DOJ are investigating Key also fails. Key did disclose the jurisdictions where it has business operations and warned investors of the risks of an FCPA violation in each of its quarterly and annual SEC filings, yet Plaintiffs ignore these admonitions. Many American companies conduct international business in markets like Mexico and Russia. Merely conducting business in one of these countries does not show knowledge of alleged FCPA violations or make any statement challenged in the complaint false or misleading.

Nor does the fact that an SEC investigation is ongoing establish scienter without facts showing that a specific person knew of any purported wrongdoing.  Plaintiff does not explain how the ongoing investigation of Key shows that Whichard made a false statement, no less that he had the scienter required by the PSLRA.

Nor does Plaintiff's vague assertion that Defendants' Sarbanes-Oxley certifications reveal scienter.  Even though the certifications relate to internal controls over financial reportings and disclosures, not FCPA compliance, Lead Plaintiff fails to identify anything in the certifications that is false, and it does not claim that Key misstated any financial information.  *In re Invision*, 2006 WL 538752 at *6.  Even if it had, the signing of a Sarbanes-Oxley certification that is required by law, by itself, does not establish a strong inference of fraudulent intent.  Instead of quoting the whole certification, as was done here, Plaintiffs must identify the particular statement(s) in the certification that is (are) allegedly false or misleading and plead facts explaining why it is (they are) false or misleading.  *In re Invision Techs.,* 2006 WL 538752, at *6.  The complaint fails to allege any particularized facts that clearly contradict statements within the certifications.  Plaintiffs must also provide facts showing that "the officer who signed the certification had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags.' that the financial statements contained material misstatements or omissions." *Shaw Group*, 537 F.3d at 545.  No such facts are pleaded here.

The complaint does not allege any motive of any defendant, in making false or misleading statements, showing he benefitted from any alleged FCPA violation, such as by selling stock at inflated prices. Nor do Plaintiffs raise an inference of fraudulent intent on Whichard's part that is as cogent and compelling as the opposing inference that he did not have fraudulent intent. *Tellabs*, 551 U.S. at 324.

Last of all, because Plaintiffs have failed to state a claim for a primary violation of § 10(b) and Rule 10b-5 by any defendant, any derivative control person claim also fails.

### Lead Plaintiff's Opposition (#51)

The Court largely agrees with Defendants' analysis of the substantial pleading deficiencies of the complaint and finds Lead Plaintiff's opposition to be filled with the same problems as the complaint. It is comprised of generalized, indefinite, unsupported assertions and arguments, like the allegations in the complaint, which it simply repeats and which fail to meet the pleading requirements which the Court has set forth in detail.

As a threshold matter the Court notes the total inadequacy of Lead Plaintiff's one-paragraph, four-sentence summary of the standard of review (#51 at p. 10), which, given the securities fraud context of the PSLRA and Rule 9(b) (which Lead Plaintiff seemingly ignores), incorrectly asserts, "A plaintiff may survive a 12(b)(6) motion even if 'recovery is very remote and untimely.' *Twombly*, 550 U.S. at 555." This erroneous standard may be one reason why Lead Plaintiff's complaint is fatally deficient. Moreover, since Lead Plaintiff's allegations are made

on information and belief, he must provide if not all, certainly the major, material facts supporting his contentions.

Furthermore, for purposes of the pending motions to dismiss, the Court's review is limited to allegations in the First Consolidated Amended Complaint and the documents referenced in or attached to it and the motions to dismiss and relevant materials subject to judicial notice; it may not look to matters outside these parameters, for example to Plaintiff's new comments about post-Class Period events, including that Key has spent more than $59 million on its ongoing investigation, a fact irrelevant to state a claim of securities fraud anyway, or the generalization that Key "in the wake of this expansive investigation, transitioned completely away from its international business, citing the 'secular trend of aging horizontal wellbores' and 'options for the allocation of the Company's capital.'" Plaintiffs' Opposition, #51 at p. 9. The Court focuses on the specificity of material factual allegations in the complaint, required by Rule 9(b) and the PSLRA, but clearly lacking here, and the case law interpreting the pleading requirements, which Defendants and the Court have shown undermines many of the Consolidated Complaint's conclusory claims.

The complaint repeatedly claims that numerous statements were false or misleading mainly because Key concealed that its growth and growth strategy were large due to conduct that violated the FCPA and because Key created the erroneous impression that it had internal controls in place to prevent such violations. Lead Plaintiff cannot rely on vague assertions that the SEC and DOJ

have increased their vigilance over FCPA violations generally or that Mexico and Russian are rife with corruption to establish that there were violations of the FCPA in Mexico and Russia by Key during the Class Period or vaguely to assert that during the Class Period, Key somehow violated the statute in its operations in these countries.   Indeed not a single specific violation of the FCPA (identifying the nature of the violation, when, where, and who was involved) is alleged.

Moreover, the complaint contends that Key's Code of Business Conduct and FCPA Compliance Manual, on which Key's all-too-vaguely described internal controls were based, were filled with false representations and omissions for purposes of § 10(b) and Rule 10b-5.  Not only have the Court and Defendants shown that courts has found such sources to be aspirational and immaterial puffery, but Lead Plaintiff has failed to allege particular facts demonstrating any breach by any particular Defendant, with scienter, of any employee responsibility in any particular statement set forth in those documents. *In re Franklin Bank Corp. SEC. Litig.*, 782 F. Supp. 2d at 381.

With regard to the Sarbanes-Oxley certifications, Defendants have repeatedly pointed out that they do not relate to FCPA issues, but to the accuracy of financial reports.   The complaint does not give a single example of a glaringly erroneous accounting irregularity which was knowingly certified by a Defendant here.   Defendants and the Court have pointed out that Lead Plaintiff has failed to plead requisite facts showing that each individual who signed a certification knew how, why, and when

an (identified) statement in the certification was false because of identified 'red flags' or glaring accounting irregularities.

Nor has Lead Plaintiff adequately alleged loss causation with regard to any disclosure statement targeted in the complaint, but merely alleges statements and subsequent drops or rises in the price of Key's common stock.

As pointed out, Lead Plaintiff impermissibly indulges in group pleading, in inferring knowledge of falsity based on individual Defendants' positions at Key, in failing to allege specific facts that a give rise to a strong inference of scienter, not to mention in failing holistically and comparatively to weigh allegations and consider plausible nonculpable explanations for a defendant's conduct in the process of showing that there is a cogent and compelling inference of scienter for each individual defendant (*Tellabs*, 551 U.S. at 757).

Furthermore, to satisfy the reliance element in a fraud-on-the-market securities fraud action, Lead Plaintiff must allege facts showing not only that each alleged misrepresentation was publicly known and was material, but that Key's stock traded in an efficient market, and plaintiff traded the stock between the time when the misrepresentation was made and when the truth was revealed. *Erica P. John Fund*, 134 S. Ct. at 2408.

Lead Plaintiff has also erroneously relied too heavily on short, generalized statements of unnamed CWs without "discounting" them and providing corroborating "documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs," as the Fifth Circuit

-101-

recommends (*Shaw Group*, 537 F.3d at 535; *ABC Arbitrage*, 291 F.3d at 351-52, *quoting Novak*, 216 F.3d at 313-14.).

Accordingly, the Court

ORDERS that Defendants' two motions to dismiss (#49 and 50) are GRANTED.  Furthermore, the Court

GRANTS LEAVE to Lead Plaintiff to file within 20 days a Second Consolidated Amended Complaint that satisfies the heightened pleading requirements of Rule 9(b) and the PSLRA or to inform the Court that it no longer wishes to proceed with this suit.

**SIGNED** at Houston, Texas, this 31st day of  March , 2016.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE